# United States Court of Appeals for the Federal Circuit

---

**CHARLES P. ADKINS, JANE E. ADKINS,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2019-1356

---

Appeal from the United States Court of Federal Claims in No. 1:10-cv-00851-MMS, Chief Judge Margaret M. Sweeney.

---

Decided: May 29, 2020

---

JOHN FRANKLIN RODGERS, Redmon, Peyton & Braswell, LLP, Alexandria, VA, argued for plaintiffs-appellants.

NORAH BRINGER, Tax Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by TERESA E. MCLAUGHLIN, RICHARD E. ZUCKERMAN.

---

Before NEWMAN, O'MALLEY, and TARANTO, *Circuit Judges*.

O'MALLEY, *Circuit Judge*.

Charles P. Adkins and Jane E. Adkins (collectively, "the Adkinses") appeal the Court of Federal Claims' (the "Claims Court") decision dismissing with prejudice their claim for an income tax refund. *Adkins v. United States*, 140 Fed. Cl. 297 (2018) ("*Adkins II*").

This case has a long history. After receiving a favorable ruling from the IRS with respect to their refund claim, the Adkinses were forced to file suit seeking a refund when the IRS was unable to formalize the parties' settlement before the statute of limitations on the refund request was set to expire. The Claims Court ruled against the Adkinses on their refund request. On appeal, we vacated that decision. On remand the Claims Court again ruled against the taxpayers. The case now returns to us for a second appeal. For the reasons that follow, we now put an end to the Adkinses' saga by reversing the Claims Court's decision.

In the first appeal, we reviewed the Claims Court's February 16, 2016 Opinion and Order, concluded that the court misconstrued the regulation concerning the timing of a theft loss deduction, vacated the Claims Court's opinion and order, and remanded the case for further proceedings. In that appeal, we concluded that the Claims Court erred in two ways: (1) reading Treasury Regulation § 1.165-1(d)(3) as imposing a higher burden on taxpayers who attempt to recover their losses after discovering a fraud than on taxpayers who claim the same loss immediately upon discovery; and (2) holding that, where a taxpayer has filed a claim for reimbursement from those who defrauded her, the taxpayer may not claim a loss until that claim is fully resolved or abandoned. *Adkins v. United States*, 856 F.3d 914, 918–20 (Fed. Cir. 2017) ("*Adkins I*"). We explained that what a taxpayer must prove by reasonable certainty is that, as of the time the loss was claimed, there was no reasonable "prospect of recovery"; she is not required to

prove that it was certain no recovery could be had. We also explained that, while one could establish the absence of any reasonable prospect of recovery by abandonment of a claim, abandonment is not a prerequisite to such a showing. In short, we explained that the Claims Court had required too much from the taxpayers—both with regard to what they must prove and with regard to what evidence is needed to satisfy that burden of proof.

The Adkinses now allege that, in addition to erroneously finding that they failed to establish a lack of a reasonable prospect of recovery in 2004, the Claims Court improperly relied on the government's affirmative defenses; again misconstrued the relevant legal standard; ignored regulations governing the effect of a criminal indictment; and abused its discretion in denying the Adkinses' motion to compel. Because we find that the Claims Court once more misconstrued a taxpayer's legal obligations in this tax refund context and thus, required too much with respect to the showing required, we reverse the Claims Court's conclusion that the Adkinses failed to show that, as of 2004, they lacked a reasonable prospect of recovery for the losses they incurred by virtue of the substantial fraud perpetuated upon them. We do not reach the Adkinses' other objections to the Claims Court's reasoning and rulings.

## I. BACKGROUND

This appeal involves the Adkinses' claim for a federal income tax refund, based on financial losses they sustained as victims of a fraudulent investment scheme. The main facts are not in dispute. We reiterate the background facts as described by the Claims Court, however, because such facts are integral to the court's ultimate conclusion that a reasonable taxpayer "could not have known" in 2004 whether she had a reasonable prospect of recovery.

A.  The Adkinses and Their Investments
with Donald & Co.

In September 1997, the Adkinses began investing in securities with Otto Kozak, who was employed by E.C. Capital, Ltd. at the time. *Adkins II*, 140 Fed. Cl. at 300. The Adkinses continued to do so when Otto Kozak moved to GKN Securities Corp., and eventually, to Donald & Co. Securities, Inc. ("Donald & Co."), a broker-dealer of securities registered with the Securities and Exchange Commission ("SEC") and the National Association of Securities Dealers ("NASD"), in March 1999. *Id.* In late 1999, the Adkinses opened investment accounts at Donald & Co. *Id.*

Unbeknownst to the Adkinses, Donald & Co. was operating a "pump-and-dump" scheme.[1] *Id.* at 300. Donald & Co. would arrange to purchase large blocks of stock in various companies and then encourage its clients to purchase those stocks. *Id.* This sudden rush to buy a significant number of stocks would inflate the price of that stock. *Id.* Donald & Co. would subsequently sell the stock that it owned at this inflated price, resulting in gains for the company. But when the stock price would eventually decline back to a normal level, the company's customers would inevitably incur a loss because they had purchased those

---

[1]    A "pump-and-dump" scheme, as defined by the SEC, is "touting [] a company's stock (typically small, so-called 'microcap' companies) through false and misleading statements to the marketplace." *Adkins II*, 140 Fed. Cl. at 300 n. 4. Promoters of the stock may claim to have "inside" information about an impending development or to use an "infallible" combination of economic and stock market data to pick stocks. *Id.* These promoters sell their shares after the stock price is "pumped" up by the sudden rush to purchase the stock. *Id.* Once promoters "dump" their shares and stop hyping the stock, the price typically falls, and investors lose their money. *Id.*

stocks at the inflated price. *Id.* While the Adkinses were investing with Donald & Co., the company pumped-and-dumped at least five stocks: Elec Communications Corp. ("Elec"), The Classica Group, Inc. ("Classica"), My-Turn.com, Inc. ("MyTurn"), Great Train Store Co., and Tera Computer Co. *Id.* Many of Donald & Co.'s house stocks were owned via Odyssey Capital LLC, a holding company. *Id.*

By February 2000, the value of the Adkinses' investments with Donald & Co. was approximately $3.6 million. *Id.* at 301. At that time, the Adkinses' portfolio included a number of stocks, with holdings in MyTurn stock representing the vast majority of the portfolio's value. *Id.* at 301–02. It was during this month that the value of the My-Turn stock began to decline. *Id.* at 302. The Adkinses' My-Turn stock, which was valued at $2,936,250 in February 2000, had fallen to $1,029,420 by April 2000. *Id.* As a result, the equity in the Adkinses' margin account fell below the required threshold and Donald & Co. began to issue margin calls.[2] *Id.*

To meet these margin calls, Mr. Adkins instructed Otto Kozak to sell some of the Adkinses' stock holdings, particularly the MyTurn stock. *Id.* But Kozak did not follow this instruction. Instead, he convinced Mr. Adkins to retain the MyTurn stock and to meet the margin calls by transferring additional cash ($1,074,181.11) and securities (valued at $1,261,082.37) to Donald & Co. *Id.* To meet Donald & Co.'s margin calls, the Adkinses transferred certain securities

---

[2]    If a person buys on margin and the value of his securities declines, his brokerage firm can require him to deposit cash or securities to his account immediately, or sell any of the securities in his account to cover any shortfall. *Adkins II*, 140 Fed. Cl. at 302 n.12 (quoting SEC, Margin Call, https://www.investor.gov/glossary/glossary_terms/margin-call (last visited May 28, 2020)).

that they purchased through other firms, including Bear Stearns, May Davis Group Inc., and H.J. Meyers & Co., Inc. (collectively, "third-party brokers"). Through these third-party brokers, the Adkinses had purchased MyTurn stock in the amount of $143,617.72; Tera Computer Co. stock in the amount of $26,793.13; and Great Train Store Co. stock in the amount of $40,890.00. *Id.* All of the Adkinses' purchases of MyTurn stock through these third-party brokers were made at Otto Kozak's urging. *Id.*

By the beginning of 2002, the value of the Adkinses' investments with Donald & Co. had fallen below $10,000. *Id.* (reflecting a value of $9,848.62 at the end of December 2001). *Id.* On July 24, 2002, Donald & Co. ceased operations due to insufficient capital. *Id.* at 304. Donald & Co. was expelled from the NASD on March 18, 2003. *Id.* As noted below, moreover, indictments relating to this fraudulent scheme soon followed.

### B. The NASD Arbitrations, Criminal Indictments, and Criminal Forfeitures and Penalties

In 2002, after the value of the Adkinses' investments had fallen below $10,000, Mr. Adkins conducted some research and realized that he was being defrauded. *Id.* at 302. Shortly thereafter, on February 7, 2002, the Adkinses submitted a statement of claim to the NASD in support of their demand for arbitration against Donald & Co. and David Stetson, Slava Volman, and Steven Ingrassia (collectively, the "named principals"), three of the four principals at Donald & Co. *Id.* at 303. The Adkinses alleged that the respondents manipulated the value of the MyTurn stock, causing the Adkinses to incur substantial losses. *Id.* The Adkinses did not include Marc Freeman (the remaining principal at Donald & Co.), Robert Kozak (an employee of Donald & Co.), or Otto Kozak (collectively, "the Kozaks") in their complaint. *Id.* The Adkinses represented that they did not include Freeman because they did not believe he was actively involved in any of their MyTurn stock trades,

or that he had any substantial role in the fraudulent scheme. Indeed, Mr. Adkins testified that he did not know who Mr. Freeman was. J.A. 1733 ("[Mr. Adkins]: I didn't know anything about Marc Freeman whatsoever. He wasn't involved in my case. As far as I knew, he wasn't involved in the stocks I dealt with."). *See also Adkins v. United States*, No. 19-1356, Oral Arg. at 5:35–6:33, *available at* http://oralarguments.cafc.uscourts.gov/default.aspx ?fl=2019-1356.mp3 ("[Freeman's] name appeared on maybe a few trading slips but [Mr. Adkins] never really knew who he was . . . [Mr. Adkins] went after [Stetson, Volman, and Ingrassia] and not the lesser players. His view was that Mr. Freeman was not a very important part of the scheme."). Mr. Adkins explained that they decided not to add the Kozaks to their arbitration claim because Otto Kozak had advised Mr. Adkins and their arbitration attorney that they "didn't have any money." *Adkins II*, 140 Fed. Cl. at 303. Indeed, when Otto Kozak and Robert Kozak were eventually brought to court in 2004 in connection with the criminal proceedings against them, attorneys were appointed for them pursuant to the Criminal Justice Act of 1964, which provides for the appointment of counsel "for any person financially unable to obtain adequate representation." *Id.* at 303–04; *see* 18 U.S.C. § 3006A(a) (2000).

On March 24, 2003, one of the Adkinses' arbitration attorneys sent a letter to the NASD, requesting that the NASD adjourn the arbitration hearing scheduled for April 1, 2003. *Id.* at 304. The letter explained that Donald & Co. "ha[d] not responded fully to [the Adkinses'] demands for discovery and [was] no longer in business."[3] *Id.* He explained that the Adkinses needed additional time for discovery in order to proceed with the hearing. The letter

---

[3]    Mr. Adkins testified that Donald & Co. had not replied at all to the Adkinses' discovery requests. *Adkins II*, 140 Fed. Cl. at 304 n.16.

explained, moreover, that Mr. Adkins had been contacted by the Department of Justice, which was investigating Donald & Co. and certain persons associated with it. *Id.* The Adkinses had been informed that "an indictment [would] be handed down in the case" and were told that the U.S. Attorney would ask that "all civil litigation involving Donald & Co., including arbitrations, be stayed pending disposition of the criminal case." *Id.*

Based on the circumstances described in the NASD letter, the Adkinses' arbitration attorneys advised their clients that their claim likely would be forestalled based on the pending indictment and that, without discovery, the arbitration could not proceed. *Id.* The attorneys suggested, however, that the Adkinses leave their arbitration claim open in case the criminal proceedings revealed pertinent information that might enhance their arbitration position. *Id.* Mr. Adkins did not object to this suggestion, but informed his attorneys that, while awaiting the indictments, he "wasn't going to pay them anymore and there's no real need to pursue it." *Id.*

In May 2004, a federal grand jury in the Eastern District of New York returned the first of the predicted indictments against several principals and employees of Donald & Co, including Ingrassia, Volman, and the Kozaks, for "conspiracy to commit securities fraud" and "securities fraud related to the Elec and Classica stocks." *Id.* at 305. There was no charge in the indictment pertaining to fraud with respect to the MyTurn stock. *Id.* Ingrassia and Volman were also indicted for money laundering. *Id.* The indictment contained two criminal forfeiture allegations. *Id.*

> The first, which pertained to the securities fraud charges, indicated that the government intended, upon the criminal defendants' convictions, to seek the forfeiture "of any property constituting or derived from proceeds obtained directly or indirectly as a result of such offenses" pursuant to 18 U.S.C.

> § 981(a)(1)(C) and 28 U.S.C. § 2461(c), or if necessary, the forfeiture of substitute property pursuant to 21 U.S.C. § 853(p). The second, which pertained to the money laundering charges, indicated that the government intended, upon the criminal defendants' convictions, to seek the forfeiture of all property involved in the offenses, as well as all property traceable to that property, pursuant to 18 U.S.C. § 982, or, if necessary, the forfeiture of substitute property pursuant to 21 U.S.C. § 853(p).

*Id.* (internal citations omitted). Marc Freeman was not named in this indictment.

After discussing the 2004 indictment with counsel, Mr. Adkins concluded that the criminal forfeiture sections reflected the government's intention to seize "any document concerning the identity and ownership of the criminal defendants' assets." *Id.* Without these documents, the Adkinses would be unable to prove the existence of a theft loss or locate assets that could be used to reimburse the Adkinses for their theft loss. *Id.* Mr. Adkins also believed that, based on the indictment, the government intended to seize "all of the criminal defendants' assets, preventing plaintiffs from attaching those assets to recover their theft loss." *Id.*

On September 21, 2004, Stetson was charged with "conspiracy to commit securities fraud, securities fraud related to the Classica stock, and money laundering conspiracy." *Id.* at 306. Like Ingrassia and Volman's indictment, Stetson's indictment contained the same two criminal forfeiture allegations. *Id.* And, like the prior indictment, there was no mention of the MyTurn stock and no charges against Freeman. Mr. Adkins was told in 2004 of the criminal case against Stetson and the fact that it contained forfeiture counts, but Mr. Adkins did not see the actual charging document until after the 2004 tax year. *Id.*

In September 2004, Ingrassia and Stetson agreed to plead guilty to securities fraud conspiracy, securities fraud, and money laundering conspiracy. *Id.* The following month, Volman agreed to plead guilty to the same charges. *Id.* at 307. Consequently, the named principals received terms of imprisonment and supervised release. *Id.* The defendants were subject to fines exceeding $1.75 million and mandatory restitution in an amount to be determined later by the court after assessment of all losses incurred regarding the identified stocks. *Id.* With respect to forfeiture, the three criminal defendants agreed to entry of forfeiture money judgments against them in which Ingrassia would forfeit $100,000, Volman would forfeit $300,000, and Stetson would forfeit $150,000 to the United States. *Id.* The three criminal defendants' plea agreements remained under seal until August 26, 2005. *Id.* Mr. Adkins learned in 2004 from his arbitration attorneys and Otto Kozak, however, that all of the criminal defendants intended to plead guilty. *Id.*

That same year, the named principals were barred by the SEC from acting as brokers or dealers in securities. *Id.* The Adkinses learned about these SEC orders from their arbitration attorneys in 2004. *Id.* Mr. Adkins believed that, as a result of these orders, the criminal defendants' earning power would be cut off. *Id.* By the end of 2004, Ingrassia, Volman, and Otto Kozak had not paid the Adkinses anything for their losses, and the district court had not entered a restitution order. *Id.*

Criminal proceedings for the other Donald & Co. brokers continued in 2005. In August 2005, the Kozaks agreed to plead guilty to the securities fraud conspiracy and securities fraud charges filed against them. *Id.* at 307–08. Otto Kozak was sentenced in July 2006 and ordered to pay restitution in the amount of $631,482.26. *Id.* at 308. Robert Kozak was sentenced in August 2006 and ordered to pay restitution in the amount of $231,641.80. *Id.* Like the

named principals' indictment, the Kozaks' indictment did not mention MyTurn stock.  *Id.*; J.A. 1410.

In August 2005, Freeman—the only principal of Donald & Co. not charged in the 2004 indictments—was charged with conspiracy to commit securities fraud, securities fraud, and money laundering conspiracy.  *Adkins* II, 140 Fed. Cl. at 307.  Freeman's indictment did not mention MyTurn stock.  *Id.*; J.A. 1410.  Freeman agreed to plead guilty to all three charges, to forfeit $50,000 to the United States, and to pay restitution in the amount of $4,243,858.  *Adkins* II, 140 Fed. Cl. at 307.  The named principals were sentenced a few years later.  Ingrassia was sentenced in December 2009 and directed to pay restitution in the amount of $4,243,858.44.  *Id.* at 308.  Stetson was sentenced in March 2011 and directed to pay restitution in the amount of $3,590,466.50.  *Id.*  Volman was sentenced in July 2012 and directed to pay restitution in the amount of $3,590,466.50.  *Id.*  Despite these substantial judgments, however, the criminal defendants made almost no payments toward restitution.  By the time Otto Kozak passed away in April 2011, he had made restitution payments totaling $255.  *Id.*  And as of January 28, 2014, the named principals and Freeman had paid a combined total of only $7,093.27 toward their obligations.  *Id.*

In an August 12, 2005 letter to the Adkinses, the Victim Witness Coordinator from the United States Attorney's Office ("USAO") advised them of the charges filed against the Donald & Co. brokers and the Adkinses' "right to full and timely restitution as provided in law."  *Id.*  The Adkinses decided that they did not want to be officially identified as victims, however, because (1) the indictment did not mention MyTurn stock, which represented the vast percentage of their losses; and (2) the Adkinses wanted to avoid any accompanying embarrassing public exposure.  *Id.*  Accordingly, they were not included on the victim lists submitted to the federal district court for purposes of

receiving restitution with respect to their Classica and Elec stocks. *Id.* at 308–09.

As the case stands, "[c]urrently, there are no funds available from the convicted Donald & Co. brokers to pay restitution to plaintiffs." *Id.* at 310. None of the named victims of the Donald & Co. pump-and-dump scheme have been fully reimbursed for their losses; indeed, none have received anything more than *de minimis* reimbursement and there is no evidence that the convicted Donald & Co. brokers or principals possess assets sufficient to pay restitution or any judgment against them. *Id.* The Adkinses do not have "insurance or [any] other vehicle for recovery for [their] loss." *Id.*

### C. The Adkinses' Federal Income Tax Returns

While the criminal proceedings were pending, the Adkinses attempted to recoup some of their losses by claiming a federal income tax deduction. *Id.* at 309. Pursuant to section 165 of the Internal Revenue Code, taxpayers are permitted to deduct a theft loss from their income in the year that they sustained the loss. *Id.*; 26 U.S.C. § 165(a), (e) (2000); Treas. Reg. §§ 1.165-1(a), (d), 1.165-8(a) (2001). The Adkinses claimed their theft loss for the 2004 taxable year, and then carried back portions of their loss to the previous three years. *Adkins II*, 140 Fed. Cl. at 309. Accordingly, in 2006, the Adkinses timely filed federal income tax returns reflecting a total theft loss of $2,118,725. *Id.* The Adkinses sought income tax refunds of $115,736 for 2004; $24,021 for 2003; $71,621 for 2002; and $177,707 for 2001. *Id.*

On April 5, 2011, an IRS Appeals Officer concluded that, pending the final computations of the Tax Computation Specialist, the Adkinses had sustained a theft loss, and were entitled to a deduction for the 2004 tax year. J.A. 1343 ¶ 58. The Appeals Officer determined that the Adkinses had incurred a theft loss of $2,532,996.01 in 2004. *Id.* at ¶ 59. The proposed settlement, however, was never

finalized. *Adkins II*, 140 Fed. Cl. at 310. As reflected in the IRS Appeals Officer's memorandum and attached transmittal form, the IRS Office of Appeals lacked jurisdiction to settle the Adkinses' claim because the Adkinses had filed suit in the United States Court of Federal Claims before their appeal was complete. *Id.* The Adkinses explained that they were forced to seek reimbursement in this new venue because they feared that their IRS claim would be precluded due to the statute of limitations if they did not move forward. *See Adkins v. United States*, No. 16-1961, Oral Arg. at 31:16–31:40, *available at* http://oralarguments.cafc.uscourts.gov/default.aspx?fl=2016-1961.mp3 ("The IRS looked at this, and Mr. Kaplan [the Appeals Officer] was ready to grant the refund, but the statute of limitations ran out and we had to file in court.").

## D. The Claims Court's Second Determination

As noted above, the Claims Court initially ruled against the Adkinses and we vacated that determination on appeal. *Adkins I*, 856 F.3d at 916. On remand, the parties filed a joint status report indicating that no further testimony or evidence was required and proposed a schedule for supplemental briefing. *Adkins II*, 140 Fed. Cl. at 311. On October 26, 2018, the Claims Court issued an opinion, again concluding that the Adkinses are not entitled to a theft loss deduction for the 2004 tax year. *Id.* at 300.

The Claims Court assessed the evidence to determine whether the Adkinses had any reasonable probability of recovery in 2004. Two related legal principles guided this inquiry. First, the Claims Court concluded that, if a reasonable prospect of recovery was "unknowable" as of the year in which the loss was claimed, the taxpayer can never bear her burden of establishing that there was no reasonable prospect of recovery in that tax year. Second, the Claims Court assumed that, for a taxpayer to establish the absence of a reasonable prospect of recovery, she must affirmatively establish, for each potential avenue of recovery

placed in issue, that it presented no reasonable probability of recovering *any* amount of her losses, no matter how difficult the avenue nor how small the potential recovery. *See Adkins v. United States*, No. 19-1356, Oral Arg. at 26:18–27:25. It is through these lenses that the Claims Court assessed the record before it.

The Claims Court said there were three ways the Adkinses, "or any reasonable taxpayer with plaintiffs' knowledge," could have attempted to recover their losses: (1) the arbitration claim they filed against Donald & Co. and Messrs. Stetson, Volman, and Ingrassia in 2002; (2) possible claims against Freeman, Otto Kozak, and Robert Kozak; and (3) restitution in conjunction with the criminal proceedings initiated in 2004 against Donald & Co.'s principals and employees regarding the Elec and Classica stock fraud. *Id.* at 316.

With respect to the Adkinses' arbitration claim, the Claims Court explained that there was no evidence in the record that the respondents' failure to fully respond to discovery requests foreclosed the Adkinses from proceeding with their claim and obtaining an award. *Id.* at 317. "In addition, there [was] no evidence in the record that [the Adkinses] sought to determine whether Donald & Co. or Messrs. Stetson, Volman, and Ingrassia had any assets that could be used to satisfy an arbitration award." *Id.* And, although a U.S. Attorney had advised Mr. Adkins that any arbitration proceedings would be stayed pending resolution of the criminal proceedings, the Claims Court pointed out that there was no evidence of a formal request to stay. *Id.*

The Claims Court rejected the Adkinses' argument that, once Volman and Ingrassia were indicted for securities fraud and money laundering, it was clear that the government would seize all of the criminal defendants' assets and any relevant documentation, which would foreclose future recovery from them. *Id.* at 317–18. The Claims Court

concluded that knowing of an intent to plead guilty is not the same as knowing the contents of the plea agreement, which remained under seal until August 2005. *Id.* at 318. The court further suggested that the Adkinses could have pursued recovery through Odyssey Capital LLC, the holding company for Donald & Co.'s house stocks, despite the indictments. *Id.* ("Donald & Co. principals executed trades through Odyssey Capital LLC; Donald & Co. accumulated profits in bank accounts owed by Odyssey Capital LLC.").

With respect to the Adkinses' potential claims against the Kozaks and Freeman, the Claims Court concluded that a reasonable taxpayer could have concluded that he had no prospect of recovery against the Kozaks but could not have come to that same conclusion with respect to Freeman. *Id.* at 319. The court noted that Freeman was a principal of Donald & Co., served as an account representative for several of the plaintiffs' accounts for at least one year, and was not charged with any crimes until August 2005. *Id.* Accordingly, the court concluded that the Adkinses' decision to not name Freeman as a respondent in the arbitration proceedings was inexcusable. *Id.* "A reasonable taxpayer in plaintiffs' position would have pursued a claim against Freeman in 2002 or thereafter[] and would not have had any reason to suspect in 2004 that he would not be able to recover at least some of his losses through that claim." *Id.* at 319–20.

Finally, the Claims Court faulted the Adkinses for failing to pursue restitution awards through the criminal proceedings. Based on the record, the Claims Court determined that the Adkinses did not know in 2004 the charges to which the criminal defendants would be pleading guilty or any details regarding the expected restitution awards relating to the Elec and Classica stock frauds. *Id.* at 320. The court then found that, with the exception of the Kozaks, the Adkinses did not know whether the criminal defendants had the wherewithal to satisfy their restitution obligations. *Id.* at 321. The court found insufficient

evidence that the Adkinses attempted to ascertain the financial condition of any of the criminal defendants, or that the government seized any of the criminal defendants' assets prior to September 2005 "such that the assets would be unavailable for restitution." *Id.*

Based on these three possible avenues of recovery, the Claims Court concluded that the Adkinses failed to meet their burden of proving that they were entitled to claim a theft loss deduction because "a reasonable taxpayer in plaintiffs' position *could not have known*, in 2004, whether he had a reasonable prospect of recovering *at least some* of his losses." *Id.* at 316 (emphasis added). *See also id.* at 318 ("A reasonable taxpayer . . . could not have known in 2004 whether he had a reasonable prospect of recovery."); *id.* at 320 ("[The Adkinses'] reasonable prospect of recovery from Mr. Freeman was simply unknowable in 2004."); *id.* at 321 ("[P]laintiffs' reasonable prospect of recovering their losses was simply unknowable by the end of 2004.").

The Adkinses timely appealed the Claims Court's decision.

## II. DISCUSSION

"The Claims Court's legal determinations, including interpretations of statutes and regulations, are subject to de novo review," and "its factual determinations are reviewed for clear error." *Tinton Falls Lodging Realty, LLC v. United States*, 800 F.3d 1353, 1357–58 (Fed. Cir. 2015).

The Adkinses allege that the Claims Court (1) erred in its finding that the Adkinses failed to establish that they lacked a reasonable prospect of recovery; (2) misconstrued the appropriate standard for 26 U.S.C. § 165(e), 26 C.F.R. § 1.165-1(d)(3), and 26 C.F.R. § 1.165-1(d)(2)(i); (3) improperly relied on the government's affirmative defenses; (4) improperly ignored Rev. Proc. 2009-20 regarding the effect of the criminal indictment; and (5) abused its discretion when it denied the Adkinses' motion to compel.

For the reasons described below, we agree with the Adkinses that the Claims Court misconstrued the relevant legal standard and, accordingly, erred in its finding that the Adkinses failed to establish they lacked a reasonable prospect of recovery in 2004.

### A.  The Claims Court Misconstrued 26 U.S.C. § 165(e) and 26 C.F.R. § 1.165-1(d)

The Adkinses argue that the Claims Court misconstrued 26 U.S.C. § 165(e) and 26 C.F.R. §§ 1.165-1(d)(2)(i) and (d)(3) because it allegedly ruled that "abandonment of a claim must be shown with reasonable certainty even when there was no reasonable likelihood of success." Appellant Br. 1.  Though it had required that showing before the first appeal, the Claims Court did not treat abandonment as the factual predicate for the Adkinses' loss date on remand.  *See Adkins II*, 140 Fed. Cl. at 318–21.  Despite their mischaracterization, however, we agree with the Adkinses that the Claims Court misconstrued the relevant legal standard when it premised its holding on the erroneous assumptions that a taxpayer cannot establish lack of a "reasonable prospect of recovery" if (1) the prospect of recovery is "unknowable"; and (2) the taxpayer has not exhausted all avenues of recovery, at least those identified by the government as potential avenues, regardless of the likelihood of success or cost associated with pursuit of the potential avenues.  *See id.* at 316.

### i.  Treasury Regulation § 1.165-1(d)(2)(i) Does Not Require a Showing of "Knowability"

The Claims Court concluded that the Adkinses could not establish lack of a "reasonable prospect of recovery"— not because it affirmatively found evidence of a prospect but because any such prospect of recovery was "unknowable" in 2004.  *See also id.* at 318 ("A reasonable taxpayer . . . could not have known in 2004 whether he had a reasonable prospect of recovery."), 320 ("[The Adkinses'] reasonable prospect of recovery from Freeman was simply

unknowable in 2004."), 321 ("[P]laintiffs' reasonable prospect of recovering their losses was simply unknowable by the end of 2004."). The Claims Court's reliance on this "unknowable" standard was legally erroneous.

This "unknowable" language comes from *Jeppsen v. Commissioner*, 128 F.3d 1410 (10th Cir. 1997).[4] In *Jeppsen*, a Tenth Circuit panel majority affirmed a Tax Court ruling that the taxpayer was not entitled to claim a deduction on his 1987 federal income tax return for the loss of money stolen by his stockbroker Barker. 128 F.3d at 1411. Having noted that Jeppsen actually ended up recovering his losses in full in 1995, after seven years of litigation against Barker and others, including Barker's successive employers (E.F. Hutton and PJ & H), the majority laid out the bases on which the Tax Court had found that, in 1987, Jeppsen had a reasonable prospect of recovery:

> [B]y the end of 1987:(1) Barker had engaged in conduct that was both illegal and actionable; (2) Jeppsen knew what Barker had done; (3) Jeppsen began shopping for lawyers immediately and never at any time ceased attempting to recover his money; (4) Barker's former employers PJ & H and E.F. Hutton were proper co-defendants, both of whom had more than sufficient assets available to satisfy any judgment awards against them; and (5) Jeppsen filed suit in March, 1988, several months before he filed his 1987 tax return.

*Id.* at 1419.

---

[4] This language is echoed in one other case, *Vincentini v. Comm'r*, 429 F. App'x 560 (6th Cir. 2011), but the court did not rely on a finding of "unknowable" prospects when concluding that the taxpayer failed to establish that there was no reasonable prospect of recovery.

The majority upheld the Tax Court's determination, even while recognizing that "several countervailing facts indicate that Jeppsen's prospects of recovery were never, until he prevailed, 100 percent." *Id.* For example, the parties Jeppsen sued consistently disclaimed any liability, no lawyer would take Jeppsen's case on a contingency basis, and several lawyers—including the firm he eventually retained—informed Jeppsen that the case would be lengthy and expensive, with no guarantee of winning. *Id.* Notwithstanding those facts, the majority explained, Jeppsen actively pursued his suit for years (until success), the suit was not based on a meritless legal theory (it ultimately succeeded), and his ultimate recovery did not depend on the outcome of some unforeseeable intervening event. *Id.* There were, moreover, no criminal charges or forfeiture counts brought against the defendants in Jeppsen's civil suit. *Id.* The Tenth Circuit's ruling, therefore, was based on a multiplicity of facts quite different from those in this case.

Before reviewing the finding of a reasonable prospect of recovery, the majority discussed the governing legal standards. In the course of that discussion, the majority stated that "if Jeppsen's prospect of recovery was simply unknowable as of December 31, 1987, then Jeppsen would not be entitled to take the theft loss deduction in 1987." *Id.* at 1418. That statement, phrased as a conditional, appears to be dictum, *i.e.*, not necessary to the judgment. In upholding the Tax Court's finding that "as of Dec. 31, 1987, Jeppsen had a reasonable prospect of recovering" his loss, *id.* at 1417, the majority did not rely on the quoted statement, or declare that the prospects in Jeppsen's case *were* "unknowable" in 1987 but instead set forth the multiple facts, recited above, providing substantial enough indications of reasonable recovery prospects as of 1987, *id.* at 1419.

The *Jeppsen* dissent, besides disagreeing with the result, took issue with the "simply unknowable" language.

The dissent interpreted the majority's statement that an "unknowable" prospect of recovery will always doom a loss claim as an implicit requirement of affirmative proof that the loss will *never* be recovered, and it characterized that as placing an "insurmountable barrier on the taxpayer." *Id.* at 1419–20 (Kelly, J., dissenting). The dissent reasoned that the fact that Jeppsen ultimately recovered his losses did not mean he had a reasonable prospect of recovery in the years leading up to his civil victory. *Id.*

We agree with the *Jeppsen* dissent as to the inappropriateness of an unknowability standard. The governing statute and regulations do not require affirmative proof that a taxpayer's loss will never be recovered. The regulation is clear: a taxpayer must only demonstrate that he had no *reasonable prospect* of recovery at the time. Treas. Reg. §§ 1.165-1(d)(2)(i), (d)(3). A conclusion that the prospect of recovery was "unknowable" replaces that inquiry with a term that is at best confusingly unhelpful and at worst incorrect. It is confusingly unhelpful because on its face it leaves wholly undefined the crucial questions of what it means to "know" the prospect of recovery (to what degree of certainty?) and what it means for the prospect to be unknow*able* (understanding that pursuit of possibilities of recovery vary in cost and likelihood of bearing fruit). And the "unknowable" standard is a departure from the "reasonable prospect" regulation if the recovery prospect will always be deemed "unknowable" when the court can identify uncertainties in the information available as of the tax year at issue.

Although it is possible that the *Jeppsen* majority did not intend to require a taxpayer to prove that "the loss would never be recovered," the Claims Court's application of this language had that effect here. The Claims Court never concluded that there *was* a reasonable prospect of recovery in 2004, or in 2003 or 2005 for that matter. Rather, the Claims Court repeatedly stated that a reasonable taxpayer "could not have known in 2004 whether he had a

reasonable prospect of recovery" because such a prospect "would have been simply unknowable." *Adkins II*, 140 Fed. Cl. at 318–22. In fact, the Claims Court doubled down on this rule when it found that any reasonable taxpayer "could not have known at the end of 2004 the impact that the plea agreements and SEC orders would have on the financial resources of Messrs. Stetson, Volman, and Ingrassia." *Id.* at 318.

The Claims Court's reliance on this "unknowable" standard as a basis for its conclusion was erroneous because the correct inquiry focuses on a "reasonable prospect of recovery." The taxpayer does bear the burden of proving his entitlement to a theft loss deduction, *Interstate Transit Lines v. Comm'r*, 319 U.S. 590, 593 (1943), and the question as to whether there was a reasonable prospect of recovery for a particular tax year requires a binary answer: yes or no.[5] But this new standard employed by the Claims Court—whether the prospect of recovering a taxpayer's losses is unknowable—ignores the plain language of the regulation, heightens the evidentiary burden on the taxpayer, and punishes the victim for any factual ambiguity.

We also reject the government's argument that the Claims Court simply applied our holding in *Adkins I.*

---

[5]    Consistent with the general applicability of a preponderance standard of proof in civil matters, *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 (1983); *United States v. Regan*, 232 U.S. 37, 49 (1914), the taxpayer must make that showing only by a preponderance of the evidence, *see Louisville Store of Liberty, Ky., Inc. v. United States*, 376 F.2d 314, 318 (Ct. Cl. 1967); *Dargie v. United States*, 742 F.3d 243, 245 (6th Cir. 2014). Under that standard, the taxpayer must show simply that it was more likely than not that there was no reasonable prospect of recovery. *See Herman & MacLean*, 459 U.S. at 390 (preponderance means more likely than not).

*Adkins v. United States*, No. 19-1356, Oral Arg. at 16:25–18:25.  The Claims Court's opinion did not find that the taxpayers failed to demonstrate no reasonable prospect of recovery in 2004.  Rather, the Claims Court held that the presence of uncertainty will always foreclose a showing of "no reasonable prospect of recovery."  Such a holding is at odds with providing "common-sense incentives for victims of theft" to try to recover their losses from the perpetrators of the fraud before asking for tax relief.  *Adkins I*, 856 F.3d at 918.  Taxpayers would be incentivized to abandon avenues of recovery at the first sign of difficulty, rather than make good-faith efforts to recover losses.  *Id.*  ("To the extent that it is rendered more difficult to succeed on a loss claim in years subsequent to discovery [because they fear whether recovery is knowable], taxpayers will be dissuaded from these good-faith efforts."). [6]

---

[6]   The government erroneously characterizes our holding in *Adkins I* as espousing "two alternate formulations:" one pertaining to a reasonable prospect of recovery, and another pertaining to a reasonable certainty that there will be *no* recovery.  *Adkins v. United States*, No. 19-1356, Oral Arg. at 16:58–17:45 ("This court gave two alternate formulations.").  As we explained in the prior appeal, Treasury Regulation § 1.165-1(d)(3) does not set forth two different standards.  *Adkins I*, 856 F.3d at 917–18.  It sets forth a single test: the proper year in which to claim a loss is the first year in which no reasonable prospect of recovery exists anymore, starting with the year of discovery.  *Id.* at 917.  When we explained, in a footnote, that this single test could be "equivalently simplified" to mean "the first year in which it can be ascertained with reasonable certainty that there will be no recovery," we were not creating an "alternate" test.  The government's attempts to rely on this "equivalent" language to avoid the legal standard clearly set forth in *Adkins I* are unpersuasive.

Accordingly, we conclude that the Claims Court misconstrued the governing statute and regulation when it concluded that the Adkinses could not establish a reasonable prospect of recovery because that prospect was "unknowable."

### ii.  A Taxpayer Need Not Exhaust All Avenues of Recovery, Regardless of Relevance or Likelihood of Success

The Claims Court also suggested that, for a taxpayer to prove that there is "no reasonable prospect of recovery" for a particular tax year, he must pursue every conceivable avenue of recovery, no matter the cost to the victim or the likelihood of success.  In this case, the Claims Court suggested that the Adkinses should have pursued possible arbitration claims against Freeman, and restitution claims arising from the criminal proceedings against Ingrassia, Volman, and Stetson.  *Id.* at 319–20.  According to the Claims Court, the fact that certain Donald & Co. principals realized "significant profits from the pump-and-dump scheme" and owned attached assets superseded any weight afforded to the Adkinses' knowledge that all of the criminal defendants intended to enter guilty pleas to the public indictments.  *Id.* at 318–20.  We disagree.

A taxpayer need not exhaust *every possible* avenue of recovery in order to prove "no reasonable prospect of recovery."  Outside of the criminal defendants, the taxpayer likely has the greatest knowledge about the facts of his case and is the person best-equipped to decide, with the advice of counsel, which claims are worth pursuing.  Notably, the Claims Court pointed to possible avenues of recovery but did not calculate either the cost of pursuing that recovery or attempt to balance those costs against the likelihood of victory.  While a taxpayer is not free to put her head in the sand and ignore meaningful avenues of recovery, it would be a tremendous waste of resources and time for the taxpayer to pursue every option, regardless of the likelihood of

success or degree of difficulty.  As the Supreme Court explained in *United States v. S.S. White Dental Manufacturing Co.*, "a loss may become complete enough for deduction without the taxpayer's establishing that there is no possibility of an eventual recoupment . . . . The Taxing Act does not require the taxpayer to be an incorrigible optimist." 274 U.S. 398, 402–03 (1927).  Treasury Regulation § 1.165-1(d)(2)(i) acknowledges this reality.  It makes clear that we may ascertain whether a reasonable prospect of recovery exists based on an abandonment of a claim for reimbursement.  Treas. Reg. § 1.165-1(d)(2)(i).  If the IRS believed, as the Claims Court clearly did, that a taxpayer must follow through on every possible road to recovery, it would not have propagated a regulation that allows for abandonment.[7]

### B.  The Adkinses Had No Reasonable Prospect of Recovering Any Portion of Their Theft Loss in 2004

The determination of a reasonable prospect of recovery is a question of foresight and of fact, to be determined upon an examination of all facts and circumstances.  Treas. Reg. § 1.165-1(d)(2)(i).  A reasonable prospect of recovery may exist "when the taxpayer has bona fide claims for recoupment from third parties or otherwise, and when there is a substantial possibility that such claims will be decided in his favor."  *Ramsay Scarlett & Co. v. Comm'r*, 61 T.C. 795, 807 (1974), *aff'd*, 521 F.2d 786 (4th Cir. 1975).  What it means for something to be decided in a taxpayer's "favor" necessarily must take into consideration what the taxpayer's *net* recovery might be, considering the costs involved in pursuit of any potential avenue for possible recovery.  A taxpayer's reasonable prospects of recovery may be ascertained "by a settlement of the claim, by an

---

[7]    As we explained in *Adkins I*, however, a taxpayer need not "abandon" a claim to establish "no reasonable prospect of recovery."  *Adkins I*, 856 F.3d at 918.

adjudication of the claim, or by an abandonment of the claim." Treas. Reg. § 1.165-1(d)(2)(i). But as we explained in the prior appeal, the question of whether a "reasonable prospect of recovery" exists in a particular taxable year is a "holistic" inquiry. *Adkins I*, 856 F.3d at 919. "[T]he existence of an ongoing lawsuit or arbitration is only one factor to be considered among many." *Id.* at 919–20. Upon a review of the record, we conclude that the trial court's findings on remand are clearly erroneous. *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

The record demonstrates that, in 2004, the Adkinses had no reasonable prospect of recovery. By the end of 2004, the Adkinses' pending arbitration proceeding against Stetson, Volman, and Ingrassia was stagnant. The Adkinses had yet to receive a response to their discovery requests, were informed by a U.S. Attorney that all pending civil litigation would be stayed until disposition of the criminal cases, and had been advised by their arbitration attorneys that they "could not go forward [with the arbitration] given the lack of discovery documents and pending criminal indictment against Donald [& Co.] brokers." J.A. 1345; *Adkins II*, 140 Fed. Cl. at 304.

Even if there were a positive arbitration outcome for the Adkinses, the evidence as of 2004 suggested that the respondents would not have had the ability to pay for the Adkinses' losses. In May 2004, a federal grand jury in the Eastern District of New York returned an indictment against several principals and employees of Donald & Co., including Ingrassia, Volman, and the Kozaks, for conspiracy to commit securities fraud, securities fraud, and money laundering. *Adkins II*, 140 Fed. Cl. at 305. Only a few months later, Stetson was also charged with conspiracy to commit securities fraud and money laundering conspiracy. *Id.* at 306. The criminal indictments were public and contained two criminal forfeiture allegations, which stated that the government intended to seek forfeiture of any (1) assets "constituting or derived from proceeds obtained

directly or indirectly as a result of such offenses"; and (2) property involved in the offenses *Id.* at 305–06. And, in addition to the plain text of the indictments, the Adkinses had been informed by their arbitration attorneys and Otto Kozak that the criminal defendants intended to plead guilty. *Adkins II*, 140 Fed. Cl. at 307.

There was also little chance that the respondents would have secured additional employment capable of paying this theoretical arbitration award. In 2004, the SEC banned Volman, Ingrassia, and Stetson from acting as brokers or dealers in securities. *Id.* In effect, by 2004, the Adkinses were left with an arbitration that was unlikely to result in any outcome, and a hypothetical outcome that was unlikely to result in any relief. As noted above, the state of affairs prompted the Adkinses to tell their attorneys that they did not want to incur any more out-of-pocket costs in pursuit of such an unlikely benefit. *Id.* at 304.

Despite this overwhelming evidence, the Claims Court maintained that a reasonable taxpayer "could not have known in 2004 whether he had a reasonable prospect of recovery" because there was no evidence that the U.S. Attorney had actually requested the arbitration proceedings be stayed, or that, by the end of 2004, the government had actually seized any of the criminal defendants' assets and documents. *Id.* at 318. The court also criticized the Adkinses for not "attempt[ing] to ascertain the financial condition of any of the criminal defendants," *id.* at 318–19, 321, noting that the Donald & Co. principals and employees accumulated profits in bank accounts owned by Odyssey Capital LLC. To the Claims Court, it was not enough that the criminal defendants' indictments indicated that the government would seek forfeiture of "any property constituting or derived from proceeds obtained directly, or indirectly as a result of such offenses," and that all defendants intended to plead guilty. *Id.* at 306. The court suggested that the Adkinses should have independently verified the financial circumstances of each criminal

defendant, in order to confirm that there was no "reasonable prospect of recovery." *Id.*

The Claims Court required too much. There is no evidence, from the Adkinses or the government, that the arbitration proceedings would have gone forward. In 2003, the Adkinses' arbitration attorneys explained that "they could not go forward . . . given the lack of discovery documents and pending criminal indictment against Donald [& Co.] brokers"—an explanation which the NASD panel accepted. J.A. 589–90; J.A. 1345. And, as Donald & Co. had yet to reply to a single discovery request and was no longer in business, acquiring the necessary documents to proceed to an arbitration hearing seemed unlikely. J.A. 589. Indeed, the government admitted as much. *Adkins v. United States*, No. 19-1356, Oral Arg. at 26:17–17:02 ("[The Court]: [The Adkinses] couldn't do any civil discovery to get information relating to the criminal defendants because the FBI wouldn't have allowed it. [The government]: Well during the—that very well may be true, your Honor . . . . "). We reject the Claims Court's suggestion that the Adkinses needed to embark on a fishing expedition for confirmation of the respondents' assets. The question of whether the named principals had the assets to cover the Adkinses' losses was answered by the forfeiture penalties discussed in the public indictments, the Adkinses' knowledge that all the Donald & Co. defendants intended to plead guilty, and the knowledge that the SEC had taken away their livelihoods. On the off chance that any of the respondents had any available assets squirreled away in their Odyssey Capital LLC accounts—as the Claims Court implied—there was no reason for the taxpayers to believe that those funds would have been untouched by the criminal forfeiture penalties. The government had declared an intent to seize not only all financial assets related to the defendants' securities fraud but also those related to the money laundering conspiracy implicating Ingrassia, Volman, and Stetson. Indeed, the government itself admitted in a joint stipulation

that there was "*no evidence* that any of the criminal defendants . . . have substantial assets of the magnitude to pay restitution or to pay *any* judgment against them."   J.A. 1343 (emphasis added).

The Adkinses' failure to name Freeman in their arbitration claim also does not suggest that they still had a reasonable prospect of recovery in 2004.  As explained above, a defrauded taxpayer need not exhaust every avenue of recovery.  Possible avenues of recovery have varying likelihoods of success and financial burdens.  In this case, the Adkinses had the opportunity to name Freeman in their arbitration claim but did not believe they had a good faith basis to pursue a claim against him.  The Adkinses explained that they did not believe he had a substantial role in the MyTurn fraudulent scheme or recoverable assets. *See Adkins v. United States*, No. 19-1356, Oral Arg. at 5:35–6:33.   The 2004 indictments, which charged the named principals but did not include Freeman, supported the Adkinses' assumption that Freeman was not a significant player in the fraud.  *Adkins II*, 140 Fed. Cl. at 305. We reject the Claims Court's reasoning that the Adkinses' exercise of this discretion precludes a showing of "no reasonable prospect of recovery."

Nor were the Adkinses required to pursue an unlikely restitution claim for their losses in the Elec and Classica stocks to establish no reasonable prospect of recovery. There is no dispute that the Adkinses could have filled out an "Affidavit of Loss" in hopes that they might receive some compensation for their smaller losses in the Elec and Classica stocks.  But the Adkinses chose not to do so, not only because the indictment did not mention MyTurn stock (the vast majority of their losses), but also because they did not believe there would be any restitution available after the defendants forfeited their assets in accordance with their guilty pleas.  Even if the Adkinses might have recovered some of their losses via restitution—in the unlikely event that the government reneged on its declared intent to seize

all the defendants' assets or the criminal defendants obtained other funds that might satisfy a restitution order—we see no basis for deeming the prospect of such a recovery a reasonable one. A "remote possibility" of recovery is not enough; there must be "a reasonable prospect of recovery at the time the deduction was claimed . . . ." *Rainbow Inn, Inc. v. Comm'r*, 433 F.2d 640, 644 (3d Cir. 1970).

For these reasons, we conclude that the Claims Court clearly erred when it determined that the Adkinses failed to demonstrate that they lacked a "reasonable prospect of recovery" in 2004.

Because we agree with the Adkinses that the Claims Court (1) misconstrued the governing statute and regulation; and (2) erred when it concluded that the Adkinses failed to establish a lack of a reasonable prospect of recovery in 2004, we need not reach their alternative arguments regarding the government's affirmative defenses, Revenue Procedure 2009-20, and their motion to compel.

## III. CONCLUSION

For these reasons, the Claims Court's opinion and order dismissing the Adkinses' complaint with prejudice is reversed. We remand for a calculation of the Adkinses' refunds for the tax years implicated by the 2004 loss claim.

### REVERSED AND REMANDED

COSTS

Costs to appellants.