T.C. Memo. 2021-93

UNITED STATES TAX COURT

FRANK E. VENNES, JR. AND KIMBERLY VENNES, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 23860-17.                    Filed July 20, 2021.

<u>Andrew J. Holly</u>, <u>Katina M. Peterson</u>, <u>Michael A. Brey</u>, <u>Nathan E. Honson</u>,
and <u>Nathan J. Ebnet</u>, for petitioners.

<u>Blaine Charles Holiday</u>, <u>Timothy M. Peel</u>, and <u>Lisa R. Jones</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

KERRIGAN, <u>Judge</u>:  Respondent determined a deficiency of $3,655,541

and an accuracy-related penalty pursuant to section 6662(a) of $731,108 for

petitioners' 2008 tax year.  Unless otherwise indicated, all section references are to

[*2] the Internal Revenue Code in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

The issues for consideration are whether petitioners are entitled to passthrough theft loss deductions for 2008 and are liable for the penalty pursuant to section 6662(a).

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Petitioners were married and resided in Minnesota during 2008 and preceding years. They were residents of Florida when the petition was timely filed.

This matter involves petitioners' claimed passthrough theft loss deductions for taxable year 2008 relating to: (1) Metro Gem, Inc. (Metro Gem), and (2) Palm Beach Finance Partners I, L.P. (Palm Beach I), and Palm Beach Finance II, L.P. (Palm Beach II) (collectively, Palm Beach Entities). The claimed theft loss deductions at issue stem from a Ponzi scheme operated by Thomas J. Petters.

[*3] I.    The Beginning

A.    Petitioner's Background

In 1990 petitioner[1] completed a prison sentence for money laundering, narcotics, and firearms offenses.  After his release from prison, he worked for a machine shop.  Later he started a coin business in which he bought and sold certified numismatic products from and to dealers.  To finance his coin business, petitioner sought investments from members of a charitable organization whom he had met while he was in prison.

B.    Thomas Petters' Background

1.    Petters' Other, Legitimate, Businesses

In the late 1990s and into the 2000s Petters was a well-known businessperson in Minnesota.  Petters was established in the St. Paul business community and had successfully operated and worked with businesses in the consumer electronics and other consumer products areas, including consumer retail outlets such as Petters Warehouse Direct, Tom's Cyber Warehouse, Redtag, and Fingerhut.  In later years Petters purchased and owned large, nationally recognizable businesses such as Polaroid, Sun Country Airlines, and Fingerhut.

---

[1]Petitioner refers to petitioner husband.

**[\*4]**     2.     The Petters Scheme

Between the 1990s and September 2008 Petters owned and operated Petters Co., Inc. (PCI), and its parent company Petters Group Worldwide, LLC (PGW). Petters operated a fraudulent note scheme (Petters Scheme) in which he solicited loans in exchange for short-term promissory notes that PCI issued. Petters diverted funds collected through the Petters Scheme to himself and paid purported profits to existing investors using funds lent by new investors in exchange for PCI notes.

Petters represented to investors that funds lent to PCI in exchange for PCI notes would be used to finance the purchase of consumer electronics for subsequent resale for profit to national and regional "big-box" retailers such as Costco, Sam's Club, and BJ's. PCI employees, including Deanna Coleman and Bob White, regularly created false documents. These false documents included altered bank documents, purchase orders reflecting purchases of merchandise by PCI from vendors, and purchase orders showing sales by PCI to "big-box" retailers of the same merchandise. Over the course of the Petters Scheme's operation Petters received billions of dollars from investors in exchange for PCI notes. All of the purported transactions in the Petters Scheme were fictitious. Knowledge of the Petters Scheme became public on September 24, 2008.

[*5]        3.        Petitioner's Relationship with Petters

Petitioner had a close relationship with Petters that spanned decades.  In April 1995 petitioner met Petters and started a business relationship with him. Petitioner did not know Petters and was offered a meeting with him to discuss financing opportunities for Petters' businesses.

Approximately two weeks after their initial meeting, petitioner began soliciting money from individuals to invest with PCI.  Petters represented to petitioner that the first transaction involved funding a purchase of shoes that Petters would acquire from a liquidator and had presold to another party for a profit.  Petters requested a $300,000 loan from petitioner to fund the purchase.

Petitioner was not able to come up with $300,000 but was able to procure a $100,000 loan from his former employer to invest in the transaction.  Petters accepted the lower amount despite its being only one-third of the requested amount.  Within a month Petters repaid petitioner the principal amount of $100,000 and paid him an additional $10,000.  Throughout 1995 and the first half of 1996 petitioner conducted approximately six investment transactions with Petters.  Before making an investment in the initial transaction, petitioner contacted both the liquidator and the purchaser of the shoes.  Petitioner also performed a similar vetting process for the other early transactions.  During this period petitioner talked frequently with Petters.

[*6]   In 1996 because of the success of initial transactions with Petters, petitioner organized Metro Gem as an S corporation for the purpose of making loans to PCI in exchange for PCI notes.  At all times petitioner was the sole shareholder and chief executive officer (CEO) of Metro Gem.  He obtained funding for Metro Gem from outside loans, which Metro Gem pooled to lend to PCI.  Metro Gem issued interest-bearing promissory notes in exchange for loans, and then lent the cash to PCI in exchange for PCI notes.  Petitioner also invested personal funds in Metro Gem to lend to PCI.

Metro Gem carried on the Petters Scheme until it became public in 2008. When the Petters Scheme collapsed, Metro Gem held 38 outstanding PCI notes with a total principal (face value) of $130,330,000.

One investor who realized returns on her investments in PCI notes through Metro Gem was Sue Silker.  Silker began investing in Metro Gem from its beginning and maintained her investments through the following years until the collapse of the Petters Scheme in 2008.  Even with the collapse of PCI, Silker was a "net winner" because she ultimately made more money than she lost.

In 1996 Petters instructed petitioner to stop contacting vendors about transactions with PCI for Petters to be perceived as a principal instead of as a broker.  Petitioner accepted Petters' reasoning and did not make further efforts to

**[*7]** contact PCI vendors. Subsequently, petitioner hired Fred Stelter to perform due diligence for Metro Gem.

Stelter had previously served as chief financial officer and CEO of a bank. Stelter also worked as a certified public accountant (C.P.A.) for the accounting firm KPMG but had placed his C.P.A. license in inactive status since approximately 1993. When he was hired to perform due diligence for Metro Gem, Stelter's only prior experience investigating fraud was a single assignment lasting a few weeks during his employment with KPMG.

Stelter's due diligence consisted of examining bank statements, monthly transaction logs, and aging reports. The actions Stelter performed were based upon documents that PCI provided. None of Stelter's due diligence involved verifying PCI note transactions with third parties such as retailers, warehouses, or shipping companies.

Petitioner had reviewed Dun & Bradstreet reports on vendors purportedly purchasing merchandise from PCI early in his lending relationship with PCI. Review of Dun & Bradstreet reports was later performed on a continual basis for petitioner by the Christensen Agency. Petitioner instructed the Christensen Agency to alert him if the credit rating for Sam's Club or BJ's dropped below "AAA". Petitioner never received such an alert from the Christensen Agency that the credit rating for Sam's Club or BJ's had fallen below "AAA".

[*8]   Because of his relationship with Petters, petitioner was able to gain access to documents that other investors could not, such as written communication regarding late payment of PCI notes and a letter purported to be from Sam's Club confirming outstanding purchase orders.  Petitioner and Petters held meetings in person throughout the course of the Petters Scheme.  While meeting, Petters and petitioner had a conversation in which they talked about the PCI note transactions being "terribly wrong" and another in which petitioner expressed to Petters that he did not want to return to jail.

Petitioner conveyed to PCI personnel expectations of what should be included in communications with the investment funds that invested in PCI.  PCI personnel sought petitioner's input before communications were sent to these investment funds.

### 4.    The Arrowhead Funds

In approximately 1999 petitioner began working to raise funds for PCI with James Nathan Fry, founder and manager of the hedge fund Arrowhead Capital Management, LLC (Arrowhead).  Fry arranged investments in the PCI notes through Arrowhead Capital Partners II, L.P., and Arrowhead Capital Finance, Ltd. (collectively, Arrowhead Funds).  Petitioner knew that Arrowhead represented falsely to its investors that payment on PCI notes came directly from retailers, when in fact payment came from PCI.

[*9] Petitioner told Fry that he had an agreement with Petters that all communications between the Arrowhead Funds and Petters and PCI go through petitioner. From 1999 through September 2008 Metro Gem operated as a servicing agent between PCI and Arrowhead. Mostly, all communication between Arrowhead and PCI went through petitioner or Metro Gem employees.

PCI and/or Petters paid commissions to petitioner calculated as percentages of proceeds raised through the Arrowhead Funds. Between 2001 and 2008 PCI paid Metro Gem more than $48 million in commissions related to the Arrowhead Funds' investments in PCI notes.

### 5. The Palm Beach Entities

Around 2002 petitioner had discussions with David Harrold and Bruce Prevost about raising funds for PCI through Metro Gem. In 2002 and 2004, respectively, Harrold and Prevost formed the two Palm Beach Entities. Palm Beach I, a Delaware limited partnership, was established when its Certificate of Limited Partnership was filed with the Delaware secretary of state on October 25, 2002. Palm Beach II, also a Delaware limited partnership, was established when its Certificate of Limited Partnership was filed with the Delaware secretary of state on June 22, 2004. Harrold and Prevost managed the Palm Beach Entities. The

[*10] primary activity of the entities was making loans to PCI in exchange for PCI notes. Metro Gem was one of the original limited partners in both partnerships.

In 2007 petitioner, on behalf of Metro Gem, executed a document containing instructions to cash out Metro Gem's investment in the Palm Beach Entities and reinvest the funds on behalf of petitioner individually. Petitioner executed this document with the intent to confer on himself the powers and responsibilities of a limited partner. This document was effective as of April 1, 2007. In January 2008 the Palm Beach Entities requested that PCI allow its independent auditors to review PCI's financial records to gain a better understanding of the PCI notes' repayment "slowdown", but the requests were not granted.

Throughout the operation of the Palm Beach Entities from 2002 or 2003 through September 24, 2008, all communications between the Palm Beach Entities and PCI were required to and did go through either petitioner or one of Metro Gem's employees. The Palm Beach Entities had a service agreement in which they consented to pay Metro Gem to "service" their PCI note transactions. Between 2003 and 2008 PCI paid Metro Gem more than $60 million in commissions related to the Palm Beach Entities' funds invested in PCI notes.

6. Concerns Raised Regarding PCI

Petitioner's son, Denley Vennes (D. Vennes), was an employee of Metro Gem. D. Vennes expressed concerns to petitioner that PCI appeared to be

[*11] overpaying for consumer goods. D. Vennes also expressed concerns to petitioner that Metro Gem's due diligence scrutinizing PCI note transactions was inadequate. Petitioner did not investigate D. Vennes' concerns.

In August and September 2008 Prevost brought to petitioner's attention the inconsistency between the late payment of PCI invoices and reports that Wal-Mart and Sam's Club were experiencing record revenues and earnings. Petitioner forwarded the Wal-Mart and Sam's Club market reports to PCI. Petters offered various explanations for the discrepancies between the retailers' positive performance conveyed by the market reports and the declining performance of PCI notes. Some of Petters' proposed justifications were that retailers were not seeing growth specifically in the consumer electronics sector and that fourth quarter sales were not indicative of then-current conditions. Petitioner accepted Petters' explanations without any independent investigation or further verification.

7.    PCI Employee Embezzlement

In April 2008 Petters notified petitioner of fraud discovered at PCI that Petters estimated to have compromised as much as 20% of the value of the PCI notes. Petters explained that White was the alleged perpetrator suspected of embezzling funds. In response to being informed about the perpetrated fraud at PCI, petitioner requested termination of White's employment, restitution of amounts improperly taken, and an internal audit of PCI.

[*12] Petters later assured petitioner that PCI had complied with all of petitioner's demands in response to the alleged fraud at PCI. Petitioner never independently verified that any of the actions he requested of PCI had in fact been taken. He did not communicate the discovery of fraud at PCI to investors during or after April 2008. Petitioner continued to solicit new investments in PCI notes after learning of the fraud.

### 8. Fortress Buyout

In August 2008 petitioner met with Fortress Investment Group (Fortress) at the request of Petters to discuss the potential purchase of Metro Gem's PCI notes. In September 2008 petitioner began discussions with Fortress to negotiate the terms of Fortress' potential purchase of Metro Gem's and the Palm Beach Entities' PCI notes. Fortress was not willing to purchase the PCI notes at 100% of their face value. Fortress initially offered to purchase the PCI notes for 80% of their face value, but the parties ultimately decided on approximately 90% of the notes' face value. The buyout never occurred because the Petters Scheme became public before the purchase was completed.

## II. Petters Scheme Collapse

### A. PCI

Until the latter half of 2007 PCI generally paid its notes within about 90 days. Beginning in the second half of 2007 petitioner was aware of late payment

[*13] issues with the PCI notes owned by Arrowhead and the Palm Beach Entities. By February 2008 PCI notes held by Arrowhead and the Palm Beach Entities were on the verge of going into default because of late payment.

When petitioner queried Petters about the reason for the untimely payments, Petters explained that shipments of merchandise to retailers were delayed and that retailers refused to pay for merchandise until the final shipment of merchandise on a given purchase order had been received. PCI personnel or Petters additionally informed petitioner that retailers attempted to stall payment because merchandise they had agreed to purchase was no longer "front burner". Petitioner accepted Petters' explanation that retailers wanted "front burner" merchandise, for which they would pay more quickly. White gave petitioner the additional explanation that delays were, in part, due to a "logjam of shipments from the [sic] China and Korea".

Petitioner was unsure why White mentioned China and Korea because all transactions in which he engaged with PCI were domestic. Petitioner forwarded White's explanation to Metro Gem's corporate counsel, Craig Howse, for comment. Howse expressed concern that White's explanation would allow people to fill in holes with their imagination. Petitioner forwarded Howse's comments to White so that PCI could "shore up the letter" that would be sent to maintain investors' confidence despite late payment on PCI notes.

**[\*14]** Petitioner communicated the explanations he received from PCI personnel or Petters to Arrowhead and the Palm Beach Entities. Petters explained that payments for 2008 were delayed because of litigation with an investor, Marlon Quan. Petitioner did not understand how unrelated litigation with Marlon Quan would affect payment from retailers but did not perform any due diligence to investigate the matter.

Late payment of PCI notes continued into August 2008. Despite slow payments or lack of payment altogether, petitioner continued to invest millions of dollars in PCI notes through July 2008. Petitioner arranged to extend due dates of PCI notes held by Arrowhead investors so the notes would not be deemed to be in default. He made these extensions without advising investors or receiving their authorization. The extensions were intended to conceal PCI's inability to pay and to forestall investor redemptions.

When PCI note performance began to decline in 2008, a $10 million investment from an individual investor was diverted to pay for redemptions by the Palm Beach Entities. Petitioner was aware of this action. He facilitated collateral exchanges for the Palm Beach Entities in order to forestall investors from being concerned about late payment. In these exchanges the collateral underlying certain unpaid notes was allegedly exchanged for more desirable collateral and a new note with a later maturity date was issued. Howse drafted documentation to facilitate

[*15] these exchanges.  Petitioner knew these actions were not fully disclosed to the Palm Beach Entities' investors but nevertheless encouraged the Palm Beach Entities to continue soliciting money from new investors and additional funds from existing investors.

On September 24, 2008, search warrants were executed on various individuals and entities involved in the Petters Scheme, including petitioner.  The scheme became known to the general public at this time.  At the close of 2008 PCI had no creditors with secured claims and a few unsecured priority claims totaling $8,033, while many creditors, including Metro Gem, held unsecured nonpriority claims.[2]

B.    Petters Charges

On December 1, 2008, the United States filed an indictment in the U.S. District Court for the District of Minnesota alleging that Petters, PCI, and PGW engaged in a fraudulent scheme and artifice in violation of 18 U.S.C. secs. 1341, 1343, 371, 1956(h), and 1957 (2006).  Petters was tried, convicted, and sentenced to imprisonment.  He was found guilty of 10 counts of wire fraud, 3 counts of mail fraud, 1 count of conspiracy to commit mail or wire fraud, 1 count of conspiracy to commit concealment of money laundering, and 5 counts of money laundering.

---

[2]This information is reflected in the schedules filed with the bankruptcy court in December 2008.

[*16] On October 6, 2008, PCI's and PGW's, as well as Petters' remaining assets, were placed under the control of a court-ordered receivership. On October 11, 2008, PCI and PGW filed voluntary petitions under chapter 11 of the United States Bankruptcy Code. By order dated October 22, 2008, the PCI and PGW bankruptcy matters were jointly administered, along with those of several other debtors, under case No. 08-45257. On December 10, 2008, PCI made an initial filing claiming $35,365,739 in assets. On December 28, 2009, Metro Gem filed a Proof of Claim in the PCI bankruptcy. On November 30, 2009, each of the Palm Beach Entities filed a voluntary petition for chapter 11 bankruptcy relief.

C.     The Receivership

On October 2, 2008, the United States filed in the District Court a complaint for permanent injunction and other equitable relief against numerous individuals and entities, including but not limited to Petters, PCI, PGW, petitioner, and Metro Gem. On the same date the United States also filed against the same individuals and entities a motion for temporary restraining order, preliminary injunction, and other equitable relief.

By order dated October 16, 2008 (receivership order), the District Court appointed Gary Hansen (receiver) as receiver over the assets of petitioner and related entities, including Metro Gem (receivership). The receivership order granted the receiver full powers of an equity receiver. The District Court retained

[*17] exclusive jurisdiction over the receivership. The receiver was directly accountable to the appointing District Court.

The receiver took possession, custody, and control of all property, assets, and estates belonging to petitioner, Metro Gem, and entities in which petitioner had a controlling interest. All assets of petitioner, Metro Gem, and other entities named in the receivership order were deemed property of the receivership and subject to the receiver's exclusive administration.

The receivership order further authorized the receiver to maintain accurate records and to use his best efforts to preserve, protect, and use assets as allowed and ordered by the District Court. The receivership order required the receiver to comply with the Federal Rules of Civil Procedure and applicable local rules. The receivership was established to preserve assets for the future benefit of victims of the Petters Scheme. The receivership order expressly provided that "nothing in this Stipulation and Order shall limit any legal remedies available to the United States, including, but not limited to, seizing or restraining assets, or to pursue any of the assets subject to the terms of this Order". The receivership was terminated by court order dated January 25, 2011.

The District Court approved an asset distribution plan on January 25, 2011, to resolve the claims of some or all Metro Gem creditors for losses suffered in the Petters Scheme. As part of the asset distribution plan the District Court approved

**[\*18]** payment to Metro Gem creditors from assets owned by petitioner and related entities. After agreement to the asset distribution plan, some of the creditors entered a consent and release arrangement with petitioner and Metro Gem.

### D. Charges Against Petitioner

#### 1. Civil

Various entities and individuals filed claims against petitioner and Metro Gem as a result of the Petters Scheme. On October 6, 2010, the liquidating trustee of the Palm Beach Finance Partners Liquidating Trust and Palm Beach Finance II Liquidating Trust filed a complaint against petitioner and Metro Gem in the Palm Beach Entities' bankruptcy actions to recover transfers and for tort damages. In the complaint the trustee alleged petitioner and Metro Gem made false representations to the Palm Beach Entities regarding their knowledge of the PCI transactions and/or were negligent in making certain representations. One such representation was that petitioner had confirmed directly with PCI's suppliers and retailer customers the legitimacy of PCI transactions, when in fact petitioner had not done so at the direction of Petters since 1996. Another such representation was that petitioner had done "extensive" due diligence on PCI, though having only conducted minimal, if any, due diligence and having been advised by D. Vennes that more extensive due diligence should have been done. The chapter 11 trustee appointed in PCI's bankruptcy action (PCI trustee) filed a complaint against

[*19] petitioner, Metro Gem, and others on or about October 6, 2010, claiming they were "net winners" in the Petters Scheme and seeking to "claw back" some payments they received in the Petters Scheme.

### 2. Criminal

In April 2011 petitioner was charged by indictment with securities fraud and money laundering with respect to the Palm Beach Entities. In this same indictment Harrold and Prevost were also charged with securities fraud. On April 21, 2011, Harrold and Prevost each pleaded guilty to aiding and abetting securities fraud. Petitioner pleaded guilty to one count of aiding and abetting securities fraud in violation of 15 U.S.C. secs. 77q(a) and 77x (2006), and one count of engaging in a monetary transaction in property derived from a specified unlawful activity in violation of 18 U.S.C. sec. 1957.

Petitioner entered into a plea agreement which did not charge him with underlying knowledge of the Ponzi scheme. Rather, he was charged with aiding and abetting misrepresentations and omissions to investors regarding PCI note transactions. Petitioner was sentenced to 180 months in prison and is currently serving this sentence.

[*20] III.     2008 Income Tax Returns and Subsequent Audit

A.     Petitioners' and Metro Gem's 2008 Tax Returns

The receivership arranged for the preparation of Metro Gem's and petitioners' 2008 income tax returns.  The accounting firm Baker Tilly Virchow Krause LLP (Baker Tilly, formerly Virchow Krause & Co.) prepared these returns and had been doing so since 2003.  A joint Form 1040, U.S. Individual Income Tax Return, was timely filed on petitioners' behalf for the tax year ending December 31, 2008.  The parties executed multiple Forms 872, Consent to Extend the Time to Assess Tax, which ultimately extended the time for assessment to December 31, 2017.  Metro Gem elected to be taxed as an S Corporation for Federal income tax purposes and filed Form 1120S, U.S. Income Tax Return for an S Corporation, for the 2008 tax year.  Lawrence Mohr, an employee of Baker Tilly, signed both petitioners' and Metro Gem's returns as the paid preparer.

On line 14 of their 2008 return, petitioners reported a $43,839,910 loss on Form 4797, Sales of Business Property.  This amount reflected a passthrough casualty (theft) loss of $43,844,416 from Metro Gem (reported on Form 4684, Casualties and Thefts) and a gain of $4,506 related to two other businesses.  Baker Tilly calculated this amount which was derived from purported losses from the Petters Scheme that Metro Gem claimed on its 2008 return.

[*21] On line 40 of their Form 1040, petitioners claimed itemized deductions of $13,171,609. This amount included tax of $144,678, miscellaneous deductions of $42,791, and a passthrough casualty (theft) loss of $12,984,140 from the Palm Beach Entities. Both Palm Beach Entities issued to petitioner a Schedule K-1, Partner's Share of Income, Deductions, Credits, etc., for tax year 2008. The $12,984,140 theft loss petitioners reported on their Schedule A, Itemized Deductions, was derived from $5,383,982 in other losses reported on the 2008 Schedule K-1 issued to petitioner by Palm Beach I and $7,600,158 in other losses reported on the 2008 Schedule K-1 issued to petitioner by Palm Beach II.

B.     Notice of Deficiency

On March 8, 2012, the group manager and immediate supervisor of the revenue agent assigned to petitioners' examination approved in writing the revenue agent's determination to assert the section 6662(a) penalty. On April 11, 2012, respondent sent petitioners an examination report showing proposed changes to petitioners' tax for 2008, including disallowance of the passthrough theft losses and imposition of the accuracy-related penalty. In a notice of deficiency dated August 15, 2017, respondent disallowed petitioners' reported passthrough theft losses for Metro Gem and the Palm Beach Entities, determined a $3,655,541 deficiency, and determined a $731,108 section 6662(a) accuracy-related penalty.

[*22]                                    OPINION

I.      Burden of Proof

Generally the Commissioner's determinations are presumed correct, and the

taxpayer bears the burden of proving the Commissioner's determinations are

erroneous.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  The

burden of proof may shift to the Commissioner if the taxpayer establishes that he

or she complied with the requirements of section 7491(a)(2)(A) and (B) to

substantiate items, to maintain required records, and to cooperate fully with the

Commissioner's reasonable requests.  Sec. 7491(a).

Petitioners contend that they meet the requirements of section 7491(a) to

shift the burden of proof to respondent.  Conversely, respondent contends the

burden has not shifted because petitioners failed to introduce credible evidence

necessary for the burden to shift.  The resolution of these issues is decided on the

preponderance of evidence in the record.  See Knudsen v. Commissioner, 131 T.C.

185, 189 (2008), supplementing T.C, Memo. 2007-340.[3]

---

[3]In respondent's amended answer, respondent alleged for the first time that a qualified settlement fund (QSF) was established in the form of the receivership and that any theft loss deductions would be claimed by QSF as an entity and not by petitioners as individuals.  We do not address whether respondent's burden has been met regarding this issue because this is an alternative argument which does not need to be addressed.

[*23] II.  TEFRA

Petitioners contend that the notice of deficiency is invalid for partnership items because the Palm Beach Entities are partnerships pursuant to the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, sec. 402(a), 96 Stat. at 648, which established unified procedures for the IRS examination of partnerships, rather than a separate examination of each partner.[4]  See secs. 6221-6234.  Petitioners' position is that the Court does not have jurisdiction over the following items:  (1) the Palm Beach Entities' statuses as partnerships; (2) petitioner's status as partner in the Palm Beach Entities; (3) items of contribution, distribution, and allocation of income, gain, loss, deduction, etc., as reported by the entities on Schedules K-1; (4) the Palm Beach Entities' claimed deductions of theft losses pursuant to Rev. Proc. 2009-20, 2009-14 I.R.B. 749; (5) petitioner's proportional share of the losses in item (4); and (6) petitioner's adjusted bases in the Palm Beach Entities.

The TEFRA rules presumptively apply to all partnerships.  See secs. 6221, 6231(a)(1).  The TEFRA rules distinguish between "partnership items", which are subject to the TEFRA rules, and "nonpartnership items", which are not.  See sec. 6231(a)(3) and (4).  A partnership item means any item taken into account for the

---

[4]TEFRA was repealed by the Bipartisan Budget Act of 2015, Pub. L. No. 114-74, sec. 1101(a), (c)(1), (g), 129 Stat. at 625, 638.

**[\*24]** partnership's taxable year to the extent regulations prescribed by the Secretary provide that the item is more appropriately determined at the partnership level than at the partner level. Sec. 6231(a)(3).

Section 6221 provides that the tax treatment of partnership items shall be determined at the partnership level. The TEFRA provisions do not apply when the Secretary "determines and provides by regulations that to treat partnership items as partnership items will interfere with the effective and efficient enforcement" of the internal revenue laws. Sec. 6231(c)(2). This includes "areas that the Secretary determines by regulation to present special enforcement considerations." Sec. 6231(c)(1)(E).

The appointment of a receiver for a partner is one such special enforcement consideration. See sec. 301.6231(c)-7(b), Proced. & Admin. Regs. ("[T]reatment of items as partnership items with respect to a partner for whom a receiver has been appointed in any receivership proceeding before any court of the United States * * * will interfere with the effective and efficient administration of the internal revenue laws."). Under the regulation partnership items of the affected partner for any partnership taxable year "ending on or before the last day of the latest taxable year of the partner with respect to which the United States could file a claim for income tax due in the receivership proceeding shall be treated as nonpartnership items as of the date a receiver is appointed in any receivership

**[*25]** proceeding before any court of the United States". Id. For this regulatory exception to TEFRA to apply, the following requirements must be met: (1) a receiver must be appointed and (2) the partnership items in question must derive from a taxable year ending on or before the last day of the latest taxable year for which the United States could file a claim in the receivership proceeding. Id.

On October 16, 2008, the District Court appointed a receiver, who took possession of petitioner's assets, including Metro Gem. Various entities and individuals filed claims against petitioner and Metro Gem. Some of these claims were resolved as part of an asset distribution plan approved by the District Court. The partnership items at issue pertain to petitioner's tax year 2008, which closed before the termination of the receivership in 2011.

Respondent contends that pursuant to section 301.6231(c)-7(b), Proced. & Admin. Regs., the partnership items should be treated as nonpartnership items because a receiver was appointed and the United States could have filed a claim for income tax due in the receivership. Neither party disputes that the District Court appointed a receiver over the assets belonging to petitioner and the various entities in which he had an ownership interest on October 16, 2008. They dispute whether the United States could have filed a claim in the receivership proceeding during the years in question that would deem partnership items allocable to petitioner as nonpartnership items.

**[*26]** Petitioners posit three assertions as to why the United States could not have filed a claim in the receivership proceeding. First, petitioners argue that the United States could not have filed a claim because no formal claims process was established. We disagree. The text of the regulation ("with respect to which the United States could file a claim for income tax due") neither requires that the United States have a specific claim nor prescribes the manner for its submission. Rather, the word "could", as used in the regulation, merely expresses possibility. Cf. Webster's Third New International Dictionary of the English Language 323, 517 (1993). The question is not whether the United States could file a claim via a formal claims process; it is simply a question of whether the United States could have filed a claim at all.

The receivership proceeding's lack of a formal claims process did not preclude interested parties' filing claims for the District Court's review. At any point the United States could have filed a claim in the receivership, and it would have been within the District Court's authority to consider such a claim, regardless of what form it took, under its broad equitable powers to fashion relief and to determine all controversies relating to the receivership, the receivership property, the exercise of the receiver's powers, or the performance of the receiver's duties. See SEC v. Hardy, 803 F.2d 1034, 1037-1038 (9th Cir. 1986).

[*27] If the Government had filed a claim for income tax due in the receivership proceeding, such a claim would have been timely if filed at any point from the close of the taxable year at issue until the termination of the receivership in 2011. Petitioners' 2008 taxable year closed before the termination of the receivership in 2011. Accordingly, we conclude that the United States could have filed a claim in the receivership proceeding at any point between the end of the 2008 tax year and the receivership's liquidation in 2011.

Second, petitioners argue that the receiver did not have the authority or ability to respond to any claim against the assets in the receivership. We are not persuaded by this argument. From the time that the receiver was appointed until the termination of the receivership in 2011, claims could be, and in fact were, presented to the receiver and to the District Court. During that period the receiver sought out creditors, evaluated claims, negotiated a release of claims agreement, proposed a specific distribution of assets, and developed an asset distribution plan. These actions demonstrate that the receiver could respond to claims and that he did so with the District Court's guidance and petitioners' cooperation.

Finally, petitioners argue that the United States could not have filed a claim because the purpose of the receivership was to compensate a narrow class of persons comprising only Metro Gem creditors and investors. The District Court order did not exclude the United States from its description of the parties sought to

[*28] be protected through the establishment of the receivership. Rather, the District Court expressly provided that "nothing in this Stipulation and Order shall limit any legal remedies available to the United States, including, but not limited to, seizing or restraining assets, or to pursue any of the assets subject to the terms of this Order". (Emphasis added.) The District Court's intentions were further clarified by the receiver's testimony that the District Court included a stay of any actions against petitioners and other involved entities, "but it excepted out from that general stay any actions or claims that might be asserted by the United States". Accordingly, the stated purpose of the receivership does not preclude the United States from filing a claim in the receivership proceeding.

We conclude that the United States could have filed a claim in the receivership proceeding. The establishment of the receivership meets both requirements of the regulatory exception to TEFRA found in section 301.6231(c)-7(b), Proced. & Admin. Regs. Therefore, any partnership items allocable to petitioner are treated as nonpartnership items within this Court's jurisdiction. See id.

III.    Theft Loss Deductions Pursuant to Section 165

Section 165(a) allows a deduction for losses sustained during the taxable year and not compensated for by insurance or otherwise. In order to deduct a theft loss, the taxpayer must prove: (1) that a theft occurred under the law of the

[*29] jurisdiction wherein the alleged loss occurred, Monteleone v. Commissioner, 34 T.C. 688, 692 (1960); (2) the amount of the loss; and (3) the date the taxpayer discovered the loss, see sec. 165(e); Elliott v. Commissioner, 40 T.C. 304 (1963). Generally, for a taxpayer to substantiate a theft loss, the record must establish that a theft actually occurred under the law of the relevant State and the amount of the loss. See Nichols v. Commissioner, 43 T.C. 842, 884-885 (1965). The term "theft" is broadly defined to include larceny, embezzlement, and robbery. Sec. 1.165-8(d), Income Tax Regs.; see also Bellis v. Commissioner, 61 T.C. 354, 357 (1973), aff'd, 540 F.2d 448 (9th Cir. 1976). Normally, a loss will be regarded as arising from theft only if there is a criminal element to the appropriation of the taxpayer's property. See Edwards v. Bromberg, 232 F.2d 107, 110 (5th Cir. 1956).

Petitioners' alleged theft occurred in Minnesota. According to the Minnesota Criminal Code, whoever "by swindling, whether by artifice, trick, device, or any other means, obtains property or service from another person" commits theft. Minn. Stat. Ann. sec. 609.52, subdiv. 2(4) (West 2008). Respondent does not contest that losses in a Ponzi Scheme are a theft for purposes of section 165(a). See Rev. Rul. 2009-9, 2009-14 I.R.B. 735. The Petters Scheme involved the "swindling" of funds from another person.

Respondent contends that petitioners are not entitled to a theft loss deduction under section 165 because they do not meet all the requirements of section 165(e).

[*30] For a taxpayer to deduct a theft loss, the record must establish the amount of the loss and the year in which the loss was sustained. See sec. 1.165-1(c) and (d)(1), Income Tax Regs. A loss arising from theft is generally treated as "sustained during the taxable year in which the taxpayer discovers such loss." Sec. 165(e). If in the year of discovery, the taxpayer has a "reasonable prospect of recovery" on a claim for reimbursement, the loss deduction will not be sustained until "the taxable year in which it can be ascertained with reasonable certainty whether or not such reimbursement will be received." Sec. 1.165-1(d)(3), Income Tax Regs.

We will determine whether petitioners meet the requirements within section 165 only with respect to Metro Gem. We do not need to determine whether any reported losses sustained by the Palm Beach Entities qualify for theft loss treatment under section 165 because we determine that the Palm Beach Entities qualify for safe harbor treatment under Rev. Proc. 2009-20, supra.

A.    Substantiation of the Loss

Petitioners contend that the evidence shows that Metro Gem sustained losses of $130,330,000, the face value of the 38 outstanding PCI notes Metro Gem held when the Petters Scheme collapsed. Taxpayers are required to keep permanent records sufficient to substantiate the amount of any claimed deduction. See Higbee v. Commissioner, 116 T.C. 438, 440 (2001); sec. 1.6001-1(a), Income Tax Regs.

[*31] To substantiate the amount of a claimed theft loss deduction, a taxpayer must prove, at a minimum, the fair market value of the stolen property before the theft and the adjusted basis of the property. Sheridan v. Commissioner, T.C. Memo. 2015-25, at *9 (citing Griggs v. Commissioner, T.C. Memo. 2008-234, 96 T.C.M. (CCH) 248, 256 (2008)); sec. 1.165-8(c), Income Tax Regs. (providing that the amount of a theft loss deduction "shall be determined consistently with the manner prescribed in § 1.165-7 for determining the amount of casualty loss"); sec. 1.165-7(b)(1), Income Tax Regs. (providing that amount deductible as a casualty loss is determined by reference to fair market value or adjusted basis of damaged property).

Section 1.165-7(b)(1), Income Tax Regs., provides that the amount of a casualty loss shall be the lesser of the fair market value of the property before the casualty loss reduced by the fair market value immediately after the casualty, or the amount of the adjusted basis prescribed in section 1.1011-1, Income Tax Regs., for determining the loss from the sale or other disposition of the property involved. For purposes of this comparison, fair market value immediately after the casualty is considered to be zero. Sec. 1.165-8(c), Income Tax Regs.

Petitioners contend that the market value of each PCI note is equal to its face value, and the asset does not require valuation because it is cash. Petitioners have failed to produce evidence which shows that the fair market values with an

**[*32]** effective date immediately preceding the alleged theft loss are equal to the PCI notes' face values. From the record we are not able to determine the values of the PCI notes before the alleged theft.

When the theft was discovered, PCI notes were no longer performing as well as they had in the past, and Fortress was not willing to purchase PCI notes at face values. The declining performance of PCI notes and Fortress' offer to buy at less than face value does not support fair market values equal to face values.

Petitioner testified that the Metro Gem notes with PCI were generally 90-day notes. Beginning in the second half of 2007, petitioner became aware that the Arrowhead PCI notes and the Palm Beach PCI notes were paying later than 90 days. By February 2008 PCI notes held by Palm Beach and Arrowhead were on the verge of default. The late payment of PCI notes continued through August 2008.

The late payment of notes was not the only problem for PCI. On April 22, 2008, Petters informed petitioner that Bob White had embezzled funds in an amount equal to approximately 20% of Metro Gem's notes outstanding with PCI. The combination of late payments on PCI notes and White's embezzlement called into question the value of the PCI notes. Also at this time, D. Vennes raised concerns. Petitioner did not contact vendors or shippers to try to find out whether there were issues that would result in late payment. The evidence does not show

[*33] that the market values of PCI notes were their face values. Petitioners failed to substantiate the values of the notes immediately before the loss.

Without knowing the market values of the Metro Gem PCI notes, it is not possible to determine whether the theft loss deduction is appropriate under the requirements of the regulations. See sec. 1.165-7(b)(1), Income Tax Regs. Consequently, petitioners have failed to establish that Metro Gem qualified for a theft loss deduction under section 165.

B.      Reasonable Prospect of Recovery

Whether a reasonable prospect of recovery exists is a question of fact to be determined upon an examination of all facts and circumstances. Sec. 1.165-1(d)(2)(i), Income Tax Regs. "A reasonable prospect of recovery exists when the taxpayer has bona fide claims for recoupment from third parties or otherwise, and when there is a substantial possibility that such claims will be decided in his favor." Ramsay Scarlett & Co. v. Commissioner, 61 T.C. 795, 811 (1974), aff'd, 521 F.2d 786 (4th Cir. 1975). The loss deduction need not be postponed if the potential for success of a claim is remote or nebulous. Id. "[W]here the financial condition of the person against whom a claim is filed is such that no actual recovery could realistically be expected, the loss deduction need not be postponed." Jeppsen v. Commissioner, T.C. Memo. 1995-342, 70 T.C.M. (CCH)

**[\*34]** 199, 202 (1995) (citing <u>Gottlieb Realty Co. v. Commissioner</u>, 28 B.T.A. 418, 420-421 (1933)), <u>aff'd</u>, 128 F.3d 1410 (10th Cir. 1997).

The determination as to whether there is a reasonable prospect of recovery is based primarily on objective factors; the taxpayer's subjective belief may also be considered, but it is not the sole or controlling criterion. <u>Ramsay Scarlett & Co. v. Commissioner</u>, 61 T.C. at 811; <u>see also</u> <u>Jeppsen v. Commissioner</u>, 128 F.3d at 1418. Objective factors relevant to this inquiry include but are not limited to: (1) the probability of recovery, <u>Parmelee Transp. Co. v. United States</u>, 351 F.2d 619, 628 (Ct. Cl. 1965); (2) the status of the claim, <u>Alioto v. Commissioner</u>, 699 F.3d 948, 954 (6th Cir. 2012), <u>aff'g</u> T.C. Memo. 2011-151; sec. 1.165-1(d)(2)(i), Income Tax Regs.; and (3) the availability of civil or criminal restitution, <u>Vincentini v. Commissioner</u>, T.C. Memo. 2008-271, <u>supplemented by</u> T.C. Memo. 2009-255, <u>aff'd</u>, 429 F. App'x 560 (6th Cir. 2011). With respect to the second factor, courts may consider claims not actually filed or pursued by a taxpayer. <u>Whitney v. Commissioner</u>, 13 T.C. 897, 901 (1949); <u>Lapin v. Commissioner</u>, T.C. Memo. 1990-343, <u>aff'd</u>, 956 F.2d 1167 (9th Cir. 1992).

If at the close of the year there exists a claim for reimbursement "with respect to which there is a reasonable prospect of recovery", no portion of the theft loss will be considered to have been sustained in that year, and the theft loss will not be considered sustained until it becomes reasonably certain that reimbursement

**[\*35]** will not be received. Sec. 1.165-1(d)(3), Income Tax Regs. A taxpayer is also not entitled to deduct a theft loss if the prospect of recovery was simply unknowable by the end of the year for which the loss is claimed. Jeppsen v. Commissioner, 128 F.3d at 1418.

Petitioners argue that there was no prospect of recovery of Metro Gem's investments at the close of 2008 because (1) PCI was insolvent; (2) the Government was seeking a forfeiture order that would result in seizure of all assets owned by PCI and Petters; (3) PCI's bankruptcy trustee filed "claw back" actions against Metro Gem which would offset and eliminate any possible restitution that Metro Gem might have received from PCI; and (4) petitioner's subjective understanding as the CEO and sole shareholder of Metro Gem was that in 2008 Metro Gem had "no chance" of recovering its losses from PCI.

In Adkins v. United States, 960 F.3d 1352, 1363 (Fed. Cir. 2020), the Court of Appeals held that "[t]he governing statute and regulations do not require affirmative proof that a taxpayer's loss will never be recovered", and uncertainty at the time of deduction does not "foreclose a showing of 'no reasonable prospect of recovery.'" In support of their argument that no reasonable prospect of recovery existed at the close of 2008, petitioners contend that this case is "entirely on point" with the Adkins decision in which the Court of Appeals held that the taxpayer did not have a reasonable prospect of recovery.

**[*36]** Respondent argues that this case is distinguishable from <u>Adkins</u> for several reasons. First, PCI's financial condition at the close of 2008 did not foreclose any reasonable prospect of recovery because insolvency is a given in a bankruptcy and is not determinative of whether a party may recover. Respondent further contends that other avenues of recovery were available to petitioners at the close of 2008, e.g., a bankruptcy trustee might have pursued adversary proceedings against the parties. In <u>Adkins</u>, by contrast, the perpetrators agreed to forfeiture and restitution payments. <u>See</u> <u>id.</u> at 1358.

Second, respondent asserts that this case differs from <u>Adkins</u> because petitioner had frequent communication with Petters and considerable involvement in the Petters Scheme as one of its primary fundraisers and as a servicing agent for other funds. Petitioner had a close relationship with Petters that spanned decades. In 2008 he continued to seek out additional investors to be lured in when he knew very well that performance was declining and that something was "seriously wrong". Respondent concludes that petitioner's actions are significantly different from those of the taxpayers in <u>Adkins</u>, who had no involvement in the fraudulent scheme other than investing their own money, and who, when they had misgivings, promptly engaged in research which led them to discover they were being defrauded. Petitioner made no or minimal efforts to independently research whether he was being defrauded, despite ample opportunity to do so.

[*37] Finally, respondent contrasts the absence of a bankruptcy proceeding--which affords the prospect of additional avenues of recovery--in <u>Adkins</u> and the taxpayers' inability to secure documents necessary to prove their theft loss or find assets against which they might submit a claim. See <u>Adkins</u>, 960 F.3d at 1358. In this case there was a bankruptcy proceeding in which the PCI bankruptcy trustee could and did pursue other avenues of recovery for victims. Petitioner also had all documents necessary to advance his claim that a theft had occurred and the ability to submit a claim against PCI.

We agree with respondent. At the close of 2008 PCI had no creditors with secured claims and a few unsecured priority claims totaling $8,033, while many creditors, including Metro Gem, held unsecured nonpriority claims.[5] Any claims that Metro Gem and petitioner might have had against PCI were not speculative, and petitioner's prospects of recovering the theft loss were not remote. Furthermore, Petters' then-recent indictment left open the possibility of future criminal restitution.

Petitioners also argue that no reasonable prospect of recovery existed because any possible restitution that Metro Gem might have received from PCI would have been offset and eliminated by the "clawback" actions PCI's

---

[5]This information is reflected in the schedules filed with the bankruptcy court in December 2008.

[*38] bankruptcy trustee planned to and in fact did file against Metro Gem. This action sought to recover payments made to Metro Gem over the life of the Petters Scheme. Whether petitioner or Metro Gem might have recovered losses from PCI is an entirely separate matter from any potential adversary proceedings such as the PCI trustee "clawback" actions. The possibility that petitioners might have been unable to keep the proceeds of a recovery from PCI bears little weight on whether there was a prospect of receiving proceeds in the first place. Moreover, petitioners' argument that the "clawback" actions would subtract from recovery proceeds indicates that petitioners acknowledge that there was a prospect of recovery or that it was unknowable at the close of 2008.

Petitioners contend that petitioner's subjective understanding, as the CEO and sole shareholder of Metro Gem, that in 2008 Metro Gem had "no chance" of recovering its losses from PCI should bear weight in our analysis of whether Metro Gem had a reasonable prospect of recovery. While a taxpayer's attitude and conduct are not to be ignored, his or her subjective understanding is not the decisive factor. See Vincentini v. Commissioner, T.C. Memo. 2009-255. We find that petitioner's conclusion that Metro Gem had "no chance" of recovery at the end of 2008 was not an objectively reasonable decision because at that point, the aftermath of the Petters Scheme was in its early stages and no final decision could have reasonably been made at the time.

[*39] Taking into consideration the amount of money at stake, the assets available to the bankruptcy trustee, and the possibility of obtaining legal restitution via other avenues, we conclude that petitioners could not have known in 2008 whether PCI had sufficient assets to allow them to recover their investments. We find that the prospect of recovery for investors in the Petters Scheme was unknowable at the close of 2008. Accordingly, we conclude that petitioners are not entitled to a theft loss deduction for losses purported to be sustained by Metro Gem under section 165.

Petitioners alternatively argue that even if we find that the loss was unknowable at the end of 2008, recovery would have been unknowable only as to a portion of the loss, specifically, 5%, and that they are entitled to deduct the remaining portion of 95%. Respondent contends that this argument is "pure conjecture" and deserves no consideration because petitioners' distinction between unrecoverable and unknowable portions of their alleged theft loss is entirely without support. We agree with respondent that there is no evidence to support the claim that 95% of the loss is deductible.[6]

---

[6]Respondent raises as an alternative argument that the receivership is a QSF and the QSF should deduct the sec. 165 losses and not petitioners. The receivership assets included those belonging to petitioner and any entities that petitioner owned or controlled, including Metro Gem. Because petitioners are not entitled to the sec. 165 deduction for the passthrough losses for Metro Gem, we do not address this alternative argument.

[*40] IV.   Rev. Proc. 2009-20

Petitioners seek relief for the investments by Metro Gem and the Palm Beach Entities under the safe harbor provisions of Rev. Proc. 2009-20, supra, for taxpayers who experience losses from criminally fraudulent investment schemes.[7] According to petitioners the Palm Beach Entities lost $199,318,000 and $830,535,000, respectively, in the Petters Scheme.  Petitioners contend that the losses allocated to petitioner on Schedules K-1 for 2008 should be deductible.

In April 2009 the IRS published administrative guidance regarding Ponzi schemes, Rev. Rul. 2009-9, supra, and Rev. Proc. 2009-20, supra, as to what the Commissioner considered to be the proper treatment of losses from certain investment arrangements that are later discovered to be fraudulent.  The former addresses the tax treatment of losses from Ponzi schemes in the light of section 165 and its accompanying regulations.  The latter provides "an optional safe harbor under which qualified investors * * * may treat a loss as a theft loss deduction when certain conditions are met."  Rev. Proc. 2009-20, sec. 2.04, 2009-14 I.R.B. at 749.  This revenue procedure applies at the entity level.

The safe harbor is made available to a "qualified investor" who experiences a "qualified loss".  Id. sec. 5.01, 2009-14 I.R.B. at 750-751.  A qualified loss is

_____

[7]We note that revenue procedures are not binding on this Court.  See, e.g., Raifman v. Commissioner, T.C. Memo. 2018-101, at *48.

**[*41]** defined to include a loss "from a specified fraudulent arrangement in which, as a result of the conduct that caused the loss", the lead figure was charged by indictment or information with the commission of "fraud, embezzlement or a similar crime that, if proven, would meet the definition of theft for purposes of § 165". Id. sec. 4.02(1), 2009-14 I.R.B. at 750. A qualified investor is defined as one generally qualified to deduct theft losses under section 165 who "did not have actual knowledge of the fraudulent nature of the investment arrangement prior to it becoming known to the general public". Id. sec. 4.03(2), 2009-14 I.R.B. at 750.

We conclude that petitioners do not qualify for the safe harbor with respect to Metro Gem because petitioners have failed to meet all the requirements of the revenue procedure. Petitioners have not established the existence of a qualified investment or qualified investor within the meaning of Rev. Proc. 2009-20, supra. For the Palm Beach Entities, however, petitioners meet the requirements of Rev. Proc. 2009-20, supra.

### A. Metro Gem

#### 1. Qualified Investment

Rev. Proc. 2009-20, sec. 5.02, 2009-20 I.R.B. at 751, provides that taxpayers must calculate the amount of the theft loss deduction by taking a stated percentage

**[*42]** of the "qualified investment" as defined in section 4.06 and subtracting any potential or actual recovery.

Rev. Proc. 2009-20, sec. 4.06, 2009-20 I.R.B. at 750, defines a qualified investment as the excess, if any, of:

(a) The sum of--

(i) The total amount of cash, or the basis of property, that the qualified investor invested in the arrangement in all years; plus

(ii) The total amount of net income with respect to the specified fraudulent arrangement that, consistent with information received from the specified fraudulent arrangement, the qualified investor included in income for federal tax purposes for all taxable years prior to the discovery year, including taxable years for which a refund is barred by the statute of limitations; over

(b) The total amount of cash or property that the qualified investor withdrew in all years from the specified fraudulent arrangement (whether designated as income or principal).

Respondent argues that Metro Gem did not calculate its loss in a manner consistent with the guidance. Respondent further contends petitioners calculated the passthrough loss from Metro Gem by taking into account the unpaid and outstanding PCI notes as of December 31, 2008. Respondent concludes that petitioner's calculations failed to report the total amount invested, the income reported, and the amount withdrawn from the specified fraudulent investment in all years.

[*43] Petitioners contend that Metro Gem's calculation of its theft loss was done in accordance with the guidance. Theodore Martens testified as an expert on petitioners' behalf. He calculated that Metro Gem's qualified investment in PCI was $130,330,000. This amount was calculated by adding all the cash Metro Gem invested in PCI to the total amount of net income received from PCI that Metro Gem reported for all taxable years before the discovery year and then subtracting the total amount of cash or property withdrawn from PCI. To perform this calculation, Martens traced the flow of cash relevant to ascertain a qualified investment.

According to petitioners Metro Gem's total cash invested in the Petters Scheme is $130,330,000. This figure is the purported amount of the principal of the unpaid, open PCI notes as of September 2008, and petitioners treat it as the cash investment for the outstanding PCI notes. Petitioners contend that the net income is zero because no interest was paid, and the total amount withdrawn was zero because PCI paid no interest or principal.

Petitioners' calculations fail to include the total amount invested, the income reported, and the amount of cash and property withdrawn in all years, as Rev. Proc. 2009-20, supra, specifies. Petitioners defend their calculations by arguing that "there was no loss on any of Metro Gem's PCI notes except the $130,330,000 outstanding at the time the scheme imploded, and that Metro Gem's investments

**[*44]** were all short-term loans that, until September 2008, were repaid in full in accordance with their terms, with each loan being a discrete, separately documented transaction". According to petitioners the requirement that the qualified investment include the total amount of cash invested in the arrangement "plainly refers to the active, ongoing investment in the Ponzi scheme" and "does not require that the repaid, closed notes be included in the calculation". Petitioners' position fails to consider the "in all years" requirement of the revenue procedure.

They further argue that even if the other years' numbers were required for the calculations, adding them to the calculation would not change the outcome of the calculation in any manner. Petitioners' reasoning is that each closed transaction would equally increase and decrease the theft loss figure because increases for amount of principal lent (amount of cash invested) and the accrued interest receivable (net income) would be offset in equal amounts by decreases for repaid principal and interest received (cash or property withdrawn).

Petitioners argue that even if the guidance "did technically require the calculation to include closed transactions", Metro Gem substantially complied with the requirements. As the Court observed in Giambrone v. Commissioner, T.C. Memo. 2020-145, at *11, "Rev. Proc. 2009-20, supra, * * * is an exercise of administrative discretion on the part of the IRS, offering beneficial treatment for

[*45] categories of theft losses meeting certain well-defined conditions. * * * [Taxpayers] cannot gain the benefit of it without adhering to its conditions the IRS imposed." See also Beech Trucking Co. v. Commissioner, 118 T.C. 428, 444 (2002).

Finally, petitioners assert that the expert testimony at trial should suffice to meet the substantive calculation requirement. Petitioners refer to Martens' testimony in support of their position. They contend that Martens' calculations show that if at the time of filing its tax return Metro Gem's theft loss calculation had accounted for the originally excluded "closed transactions", it would have produced the exact same number as that which Metro Gem originally reported as its theft loss amount. Retroactively estimating what the calculation would have produced does not retroactively bring into compliance the calculations that were used as the basis of the claimed deduction at the time the tax return was filed. Accordingly, we conclude that petitioners fail to qualify for safe harbor treatment under Rev. Proc. 2009-20, supra, because they have not substantiated the existence of a qualified investment for Metro Gem.

2.    Qualified Investor

The safe harbor is available to a "qualified investor" who experiences a "qualified loss". Rev. Proc. 2009-20, sec. 5.01. A qualified investor is a United States person: (1) that generally qualifies to deduct a theft loss under section 165

[*46] and section 1.165-8, Income Tax Regs.; (2) that did not have actual knowledge of the fraudulent nature of the investment arrangement before it became known to the general public; (3) with respect to which the specified fraudulent arrangement (SFA) is not a tax shelter; and (4) that transferred cash or property to an SFA (but not an individual who invested in a fund that later invested in the SFA). Id. sec. 4.03.

The first reason petitioner does not meet the definition of a qualified investor is that we have already held that he does not qualify to deduct a theft loss under section 165. This alone is sufficient to support our holding; however, we continue our analysis with an examination of the actual knowledge element.

Petitioners argue that the interpretation of the phrase "actual knowledge" is clear on its face as meaning a legally enforceable claim or interest. We cannot determine, by "plain meaning", what constitutes "actual knowledge" for the purpose of Rev. Proc. 2009-20, supra; hence, we consult other interpretive principles. See Estate of Schwartz v. Commissioner, 83 T.C. 943, 952-953 (1984).

Petitioners argue that it is inappropriate to interpret the phrase "actual knowledge" to include deliberate avoidance of knowledge, citing Intel Corp. Inv. Policy Comm. v. Sulyma, 589 U.S. __, 140 S. Ct. 768 (2020), to support this assertion. The Supreme Court in Intel Corp., however, clarified that "[n]othing in this opinion forecloses any of the 'usual ways' to prove actual knowledge". Id.

[*47] at __, 140 S. Ct. at 779 (citing Farmer v. Brennan, 511 U.S. 825, 842 (1994)). The Supreme Court also made clear that the opinion "does not preclude * * * [parties] from contending that evidence of 'willful blindness' supports a finding of 'actual knowledge.'" Id. (citing Global-Tech Appliances, Inc. v. SEB S.A., 563 U.S. 754, 769 (2011)).

Respondent contends that actual knowledge encompasses avoidance of knowledge and may be shown by circumstantial evidence. The element of knowledge may be inferred from deliberate acts amounting to willful blindness to the existence of facts or acts constituting conscious purpose to avoid enlightenment. Mattingly v. United States, 924 F.2d 785, 792 (8th Cir. 1991).

We find that petitioner either knew or deliberately avoided knowing the fraudulent nature of the Petters Scheme because the evidence establishes that Metro Gem's investments in PCI were unrealistic and too good to be true. Petitioner had multiple opportunities to examine PCI's business. He was warned about problems with PCI on at least three occasions by D. Vennes and Prevost concerning overpayment for merchandise, minimal due diligence, and market reports which contradicted Petters' excuses for late payment. The evidence shows that petitioner did nothing in response to concerns that were raised.

From the start of petitioner's business relationship with Petters, there were many indications that the arrangement was too good to be true. The relationship

**[*48]** was unusual from its commencement in 1995. When petitioner met Petters, he was "trying to rebuild his life" after being released from prison. He ran a business, which he described as a modest operation, that did not own considerable inventory and that dealt in rare coins and diamonds.

At this time petitioners lived in a modest home, and petitioner was making efforts to satisfy a judgment imposed because of his past violations of Federal law. Petters, a successful businessman, reached out to petitioner and requested a $300,000 loan. This is unusual and presents the first cause for apprehension: the difference between petitioner's and Petters' financial and social status. Petitioner was able to come up with only $100,000 to lend Petters, also rendering dubious Petters' decision to proceed with the transaction as it was a mere one-third of the amount requested. The initial transaction between Petters and petitioner resembles more of a trial run than a legitimate business transaction.

Petitioner was willing to accept Petters' illogical excuses and explanations regarding suspicious occurrences without doing research. He assisted Petters in attempts to bolster the contents of a letter reassuring investors about their PCI investments when late payments began to occur. He knew that Arrowhead made misrepresentations to investors about the source of payments, and he knew that a $10 million investment was used by PCI to pay other investors and not to purchase consumer goods, as was represented to the investors.

[*49] We likewise find it to be highly improbable that petitioner never noticed the fraudulent nature of the PCI note arrangement, because he had frequent communication with Petters--via email and phone calls as well as in-person meetings--throughout the life of the scheme. None of the actions petitioner took as due diligence--hiring Stelter, reviewing Dun & Bradstreet reports, and hiring the Christensen Agency--were objective or sufficiently thorough. The reports Stelter reviewed were all provided by PCI personnel, and petitioner never received any negative information from the Dun & Bradstreet reports via the Christensen Agency which would have indicated the opposite of the explanations petitioner accepted from Petters. The Palm Beach Entities' request for an objective audit of PCI records was not granted.

Furthermore, other individuals involved in the Petters Scheme testified that petitioner knew or must have avoided knowing about the fraudulent nature of the scheme. We do not find Silker's testimony in support of petitioners credible because she is petitioners' family friend and was ultimately a "net winner" as an investor in the Petters Scheme. Thus, her attempt to corroborate petitioner's alleged belief in the legitimacy of the PCI note transactions is overshadowed by her incentive to help petitioners personally. Finally, petitioner's negotiations to be bought out by the Fortress Group right before the collapse of the Petters Scheme indicates that petitioner was trying to escape impending fallout from PCI's demise

**[*50]** because he knew that the PCI note arrangement was a fraudulent scheme on the verge of collapsing.

The weight of the evidence before us establishes that petitioner, in his capacity as officer of Metro Gem, either knew or deliberately avoided knowing of the Petters Scheme's fraudulent nature before it became public in September 2008. Petitioner's plea agreement does not provide conclusive evidence of his lack of knowledge. The plea agreement states that petitioner was not charged with knowledge of the Petters Scheme. The plea agreement has no binding effects on this proceeding.

We find that petitioner, in his capacity as sole shareholder of Metro Gem, does not meet the definition of a qualified investor in Rev. Proc. 2009-20, supra, and, accordingly, that petitioners do not qualify for the safe harbor treatment.

B.    Palm Beach Entities

Petitioners contend that they have adequately established that the Palm Beach Entities' theft losses stemming from the Petters Scheme constitute qualified investments. The Palm Beach Entities are qualified investors because there is no evidence that shows that the Palm Beach Entities had actual knowledge of the Petters Scheme.

The other requirements of Rev. Proc. 2009-20, sec. 4.03, are met. One of these requirements is that the Palm Beach Entities generally meet the requirements

[*51] of section 165, which they do because the losses sustained from the Petters Scheme qualify as theft losses under the laws of the governing jurisdiction as required by section 165. According to Rev. Proc. 2009-20, sec. 5, if a taxpayer meets the requirements of the safe harbor, the IRS will not challenge the amount to be deducted and the taxable year in which the theft was discovered.

The accounting firm Kaufman Rossin & Co. (Kaufman) prepared the Palm Beach Entities' Federal income tax returns. In addition to preparing the Palm Beach Entities' Schedules K-1, Kaufman prepared monthly financial statements and monthly procedures reports. For the 2008 return Kaufman performed a calculation consistent with Rev. Proc. 2009-20, sec. 4.06. We conclude that the Palm Beach Entities meet the requirements and thus qualify for safe harbor treatment. Accordingly, we hold that petitioner is entitled to a passthrough deduction for the amount allocable to him as a limited partner of the Palm Beach Entities' 2008 deductible theft losses.

## V. Substantiation of Petitioner as a Limited Partner

Palm Beach I, a limited partnership, was established on October 25, 2002. Palm Beach II, also a limited partnership, was established on June 22, 2004. Metro Gem was one of the original limited partners in both partnerships.

In 2007 petitioner, on behalf of Metro Gem, executed a document for the purpose of cashing out Metro Gem's investment in the Palm Beach Entities and

[*52] reinvesting the funds on behalf of petitioner individually. This document was effective as of April 1, 2007. Petitioners contend that as of April 1, 2007, petitioner became a limited partner in the Palm Beach Entities, intending to confer on himself all the powers and responsibilities of a limited partner. Petitioner argues that the following trial evidence proves that he became a limited partner in the Palm Beach Entities:

(1) records from the Palm Beach Entities documenting updates to reflect a redemption from Metro Gem's account and a credit to petitioner's individual account;

(2) testimony from Metro Gem's auditor that Metro Gem's books and records were adjusted to reflect distributions to petitioner of Metro Gem's investment in each Partnership, and the books and records with those adjustments;

(3) statements of partner's capital issued from the Palm Beach Entities to petitioner stating the capital contributions he made to each Partnership during 2007;

(4) Schedules K-1 issued from the Palm Beach Entities to Metro Gem in 2007 reporting the distribution redeeming Metro Gem's interest in each partnership;

[*53] (5) Schedules K-1 issued from the Palm Beach Entities to petitioner in 2007 reporting petitioner's purchase of partnership interests via capital contributions matching those in the aforementioned statements of partner's capital; and

(6) statements of partner's capital issued from the partnerships to petitioner reflecting capital balances for petitioner as an individual on January 1, 2008, matching the ending capital balances shown on the 2007 Schedules K-1 and the beginning capital balances shown on petitioner's 2008 Schedules K-1.

Respondent argues that petitioners have failed to prove that partnership interest transfers occurred and therefore petitioner is not entitled to deduct passthrough losses from the Palm Beach Entities. Respondent further contends that there is no evidence showing that a general partner of either of the Palm Beach Entities gave prior written consent for a purported assignment of Metro Gem's limited partnership interest to petitioner, as required by section 10.2 of Palm Beach I's partnership agreement and section 9.2 of Palm Beach II's partnership agreement. To support respondent's position, respondent references the following requirements for a transfer of limited partnership interests, found in section 10.3 of Palm Beach I's partnership agreement and section 9.3 of Palm Beach II's partnership agreement: (1) execution and delivery to the partnerships of the necessary and appropriate instruments required to effect the transfer and delivery of such instruments to the partnerships; (2) consent by the transferee to pay all

**[\*54]** expenses associated with the transfer; and (3) assumption by the transferee partner of all obligations of the transferor that were not met.

We disagree with respondent's position for two reasons. First, petitioners have argued not that partnership interest transfers were effected in 2007 but that petitioner "cashed out" Metro Gem's investments in the Palm Beach Entities-- which he had authority to do in his capacity as sole shareholder--and reinvested those funds on behalf of himself as an individual. Petitioners do not describe partnership interest transfers, but two separate transactions, neither of which is subject to the partnership agreements' requirements for partnership interest transfers: (1) redemption of Metro Gem's partnership interests, and (2) subsequent investments by petitioner as an individual.

Petitioners have presented sufficient documentation to prove the occurrence of these two transactions, including business records from the Palm Beach Entities reflecting redemption from Metro Gem's account and a credit to petitioner's individual account; Schedules K-1 issued from the Palm Beach Entities to Metro Gem reporting the distribution in redemption of its interests; Schedules K-1 issued from the partnerships to petitioner reporting his purchase of interests via capital contributions; business records from Metro Gem showing adjusting entries to account for distributions to petitioner of Metro Gem's investments in the

[*55] partnerships[8] and statements of partner's capital issued from the partnerships to both Metro Gem and petitioner reflecting the two transactions. In the light of this evidence we conclude that petitioner became a limited partner in each of the Palm Beach Entities after April 1, 2007.

Even if we did consider petitioner's actions a partnership interest transfer, we would still conclude that the trial evidence supports petitioners' assertion that petitioner became a limited partner after such actions. Respondent's position does not take into consideration that a partnership interest might have been effected, despite the failure to meet the requirements in the partnership agreement, under principles of Delaware contract law.[9] Contract provisions and stipulations may be waived or abandoned by the express or implied mutual consent of the parties, and such consent may be evidenced by the parties' actions. Pepsi-Cola Bottling Co. of Asbury Park v. Pepsico, Inc., 297 A.2d 28, 33 (Del. 1972) ("[A]ny other provision of a written agreement may be waived or modified, including a change in the provisions of the written agreement by the course of conduct of the parties."); see also Honeywell Int'l Inc. v. Air Prods. & Chems., Inc., 872 A.2d 944, 955 (Del.

---

[8]We note that Metro Gem's business documents showing that its investments were distributed indicates that the funds were distributed to petitioner, not that the partnership interests were transferred.

[9]Delaware law would apply here because the Palm Beach Entities were both registered in Delaware and consequently any disputed partnership interest would fall within Delaware's jurisdiction to be decided under Delaware law.

[*56] 2005) ("Partial performance is 'unequivocally referable' to a modification if it 'will admit of no other possible explanation except one pointing directly to the existence of the oral agreement claimed.'" (quoting Bright Radio Labs, Inc. v. Coastal Commercial Corp., 166 N.Y.S.2d 906, 910 (App. Div. 1957)). The Palm Beach Entities acted as if petitioner became a partner. We hold that petitioner became a partner in each of the Palm Beach Entities in place of Metro Gem effective April 1, 2007.

VI.     Penalty

Section 6662(a) and (b)(2) imposes a 20% penalty on an underpayment of tax required to be shown on the return if it is attributable to a substantial understatement of income tax. An understatement of income tax is "substantial" if it exceeds the greater of $5,000 or 10% of the tax required to be shown on the return. Sec. 6662(d)(1)(A). Respondent bears the burden of production with respect to a section 6662 penalty. See sec. 7491(c). To meet this burden, respondent need only make a prima facie case that imposition of the penalty is appropriate. See Higbee v. Commissioner, 116 T.C. at 446-447. Respondent's burden of production under section 7491(c) also includes establishing compliance with section 6751(b)(1), which requires timely supervisory approval of penalties. See Graev v. Commissioner, 149 T.C. 485, 493 (2017), supplementing and overruling in part 147 T.C. 460 (2016).

[*57] In the notice of deficiency respondent determined an underpayment due to an understatement of income tax on petitioners' 2008 tax return that exceeded the greater of $5,000 or 10% of the tax required to be shown on the return. We sustain the deficiency except for the Palm Beach Entities' passthrough losses and respondent's concessions. Respondent produced a penalty approval form signed by an IRS supervisor demonstrating timely compliance with section 6751(b)(1). Respondent has met the burden of production by demonstrating a "substantial understatement of income tax" and the required supervisory approval.

Section 6664(c)(1) provides that the accuracy-related penalty shall not be imposed with respect to any portion of an underpayment "if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith" with respect to it. The decision as to whether the taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, considering all pertinent facts and circumstances. See sec. 1.6664-4(b)(1), Income Tax Regs. Generally, the most important factor in determining the existence of reasonable cause is the taxpayer's effort to ascertain his or her correct tax liability. Id. Circumstances that may signal reasonable cause and good faith "include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer." Id.

[*58] A taxpayer acts with reasonable cause when he or she exercises ordinary business care and prudence with respect to a disputed tax item. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 98 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002). Good-faith reliance on the advice of an independent, competent professional as to the tax treatment of an item may meet this requirement. See sec. 1.6664-4(b)(1), Income Tax Regs. A taxpayer acts in good faith when he or she acts upon honest belief and with intent to perform all lawful obligations. See Rutter v. Commissioner, T.C. Memo. 2017-174, at *45.

A taxpayer alleging reasonable, good-faith reliance on the advice of an independent, competent professional must prove that (1) the adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer relied in good faith on the adviser's judgment. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 99. A taxpayer's unconditional reliance on an otherwise qualified professional does not constitute reasonable reliance in good faith for purposes of section 6664(c)(1). See Stough v. Commissioner, 144 T.C. 306, 323 (2015). A taxpayer asserting reasonable reliance must show that the opinion of a qualified adviser considered all facts and circumstances and was not based on unreasonable facts or legal assumptions. Sec. 1.6664-4(c)(1), Income Tax Regs.

[*59] Respondent argues that petitioners are liable for a section 6662(a) penalty because (1) petitioners' understatement of income tax was substantial and (2) a theft loss deduction would seem "too good to be true" to any reasonable and prudent person with the knowledge of petitioner's central involvement in financing the Petters Scheme. Respondent further contends that petitioner knew or avoided knowing that the Petters Scheme was fraudulent, failed to appropriately calculate and substantiate the amount of the loss, and failed to demonstrate the absence of a reasonable prospect of recovery.

The evidence does not show that petitioners provided the return preparer with the necessary information to file an accurate income tax return. The receivership arranged for the preparation of Metro Gem's and petitioners' income tax returns. Baker Tilly prepared these tax returns and had done so since 2003. Petitioner was aware of problems with PCI, and there is no evidence showing that he relayed this information to Baker Tilly. Also, there is no evidence substantiating that the amount of the loss was known in 2008.

Therefore, petitioners have not shown reasonable cause, and they are liable for a section 6662(a) accuracy-related penalty.

To reflect the foregoing,

A decision will be entered under

Rule 155.